[S.F. No. 22904. In Bank. Aug. 15, 1974.]

SANDY KNOLL, Petitioner, v.
RENE C. DAVIDSON, as Registrar of Voters, etc., Respondent.

336

**COUNSEL**

Marjorie Gelb, Clifford Sweet, Vernon W. Salvador, William R. Petrocelli and John H. Erickson for Petitioner.

Richard J. Moore, County Counsel, and James E. Jefferis, Assistant County Counsel, for Respondent.

## OPINION

**SULLIVAN, J.**—We deal here with vital and sensitive questions involving the rights of candidates for public office and the remedies invocable to preserve such rights in the course of the electoral process. We are called upon to examine the constitutionality of statutes prescribing the payment of fees for filing declarations of candidacy for county offices to be voted upon at a direct primary election. We are also presented with the question whether the alleged statutory requirement of prepayment of the prorated cost of the printing and handling of the candidates' statements of qualifications in the voter's pamphlet passes constitutional muster. Finally, we must determine the nature, scope and finality of the procedure designed to secure a judicial order correcting or preventing error or wrongful act in respect to an official primary election ballot.

As will appear, we conclude that, absent a reasonable alternative means of access to the ballot, the statutes here under consideration, which require the payment of a fee as a condition to the filing of a declaration of candidacy, violate the equal protection clause of the Fourteenth Amendment to the United States Constitution. We further hold that although prepayment of the prorated cost of publishing the candidate's statement of qualifications may not be constitutionally required, the statute in question constitutionally permits the candidate to be billed for such cost after the voter's pamphlet has been printed and distributed. Finally, we conclude that the procedure provided in the Elections Code for the correction or prevention of errors in the direct primary ballot is a form of relief in the nature of a writ of mandate which should proceed through our court system in the manner and with the results prescribed for the traditional writ of mandate. We issue an appropriate order effectuating these conclusions.

On February 14, 1972, Alphonso Zapata went to the office of Rene Davidson, the Registrar of Voters for Alameda County (Registrar) and requested an application for a declaration of candidacy for the Alameda County Board of Supervisors for the June 6, 1972, primary election. On February 15, 1972, Sandy Knoll went to the Registrar's office for the same purpose. Both Knoll and Zapata were informed by the Registrar that they were each required by the Elections Code to pay a fee of $295.76 before they could receive the necessary papers to become a candidate. Each of them in turn told the Registrar that he or she was unable to pay the filing fee and inquired if there was any way of becoming a candidate without paying the filing fee. The Registrar informed

them in substance that payment of the fee was a prerequisite to running for elective office.

On February 18, 1972, Zapata and Knoll, on behalf of themselves and all other persons allegedly eligible and desiring to become candidates for elective office, but unable to pay the requisite filing fees, filed in this court a petition for a peremptory writ of mandate and for a declaratory judgment. They were joined in their petition by Partido La Raza Unida, Fairfax Community Volunteers and Joan Mangin, on behalf of themselves and all other registered voters, allegedly desiring to consider and vote for petitioners Zapata and Knoll as well as all other similarly situated prospective candidates. Petitioners prayed that this court: (1) issue a peremptory writ of mandate directing the Registrar (a) to accept Zapata and Knoll's applications for declarations of candidacy and to place their names on the ballot for the June 6, 1972, primary election without payment of the prescribed filing fees; and (b) to include Zapata's and Knoll's statements of qualifications in the voter's pamphlet without prepayment of their pro rata share of the printing and handling cost; and (2) "issue its declaration" that the Elections Code sections prescribing candidate filing fees and prepayment of printing costs for statements of qualifications are unconstitutional.

We transferred the petition to the Court of Appeal, First Appellate District. On March 6, 1972, Division One of that court denied the petition without opinion on the ground that the relief prayed for could not be granted before March 10, 1972, the date established by law for filing declarations of candidacy.

On March 8, 1972, the same petitioners filed in the Court of Appeal a petition pursuant to Elections Code section 6403 incorporating by reference all the allegations of, and all the affidavits and memoranda accompanying, their earlier petition for writ of mandate, and seeking the same relief. On the same day the Court of Appeal issued an order to show cause directed to the Registrar and returnable the following day. On March 9, 1972, the Court of Appeal issued a conditional order, directing the Registrar to accept Zapata's and Knoll's nomination papers and statements of qualifications, but reserving jurisdiction to determine whether their names should be placed on the ballot without paying the prescribed filing fee and whether their statements of qualifications should be included in the voter's pamphlet without the requisite prepayment of their pro rata share of the cost.

On April 11, 1972, the Court of Appeal, by written opinion, ordered Knoll's[1] name placed on the ballot without payment of the filing fee and her statement of qualifications, as modified, included in the voter's pamphlet without requiring prepayment of her pro rata share of the cost. The Court of Appeal opinion purported to be final forthwith and unreviewable upon appeal.

In view of this last holding, the Registrar sought review of the decision by filing in this court a petition for a writ of certiorari. We denied the petition but on our own motion ordered a hearing and transferred to this court the petition for relief under Elections Code section 6403 pursuant to article VI, section 12 of the California Constitution.

I

At the outset it is incumbent upon us to unravel the procedural tangle revealed by the foregoing chronology. As we explain *infra*, we have concluded that Elections Code section 6403 creates a special proceeding providing relief in the nature of a writ of mandate, which should proceed through the courts according to the normal procedure for prerogative writs.

The present Elections Code section 6403[2] first emerged in the law of California in 1909 as section 27 of the Primary Nomination Law. Despite codification and renumbering of sections,[3] the statute has remained

---

[1]The Court of Appeal dismissed the class action aspect of this case, limiting the proceedings to one between Zapata and Knoll on the one hand and the Registrar on the other. There has been no request made to this court seeking to reinstate the class action aspect of this proceeding. Petitioner Zapata was subsequently dismissed from the proceeding after he admitted that he was not eligible for election to the supervisorial office he sought because he did not reside within the supervisorial district. Therefore we treat the present proceeding as one solely between petitioner Knoll and the Registrar.

[2]Section 6403 provides: "Whenever it is made to appear by affidavit to the Supreme Court, district courts of appeal, or superior court of the proper county that an error or omission has occurred or is about to occur in the placing of any name on, or in the printing of, an official primary election ballot, or that any wrongful act has been or is about to be done by any person charged with any duty concerning the primary election, or that any neglect of duty has occurred or is about to occur, the court shall order the officer or person charged with the error, wrong or neglect forthwith to correct the error, desist from the wrongful act or perform the duty, or show cause why he should not do so. Any person who fails to obey the order of the court shall be cited to show cause why he is not in contempt of court."

Hereafter, unless otherwise indicated, all section references are to the Elections Code.

[3]Section 27 of the Direct Primary Law (Stats. 1913, ch. 690, p. 1408, § 27); section 2900; section 6403.

substantially unchanged. Except where clarity otherwise requires, we shall hereafter for convenience refer to the statute throughout as section 6403, even when our reference is to one of the predecessor versions.

Section 6403 authorizes an original proceeding, commenced by affidavit in the Supreme Court, a Court of Appeal or superior court of the proper county, against "any person charged with any duty concerning the primary election" for an order that such person correct any error, desist from any wrongful acts, perform any duty, or show cause why he should not do so. It seems clear that section 6403 authorizes relief in the nature of mandate,[4] and specifically permits courts to compel primary election officials to perform their duties correctly. As we recently said in *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, footnote 2 [96 Cal.Rptr. 697, 488 P.2d 1], "Mandamus is clearly the proper remedy for compelling an officer to conduct an election according to law."

Procedurally section 6403 and the traditional writ of mandate are virtually identical. The former requires an application on affidavit which, if granted, results in the issuance of an order to show cause; the latter requires an application on verified petition which, if granted, results in the issuance of a writ (which is an order) either alternative or peremptory or an order to show cause in lieu of an alternative writ depending upon the level and practice of the particular court. (See 5 Witkin, Cal. Procedure (1971) pp. 3919, 3931-3932.) Except for the fact that section 6403 may deal principally with ministerial acts of election officials, it is virtually identical with mandate.

Indeed this court has in several cases characterized a proceeding brought under section 6403 as one for a writ of mandate. (*Sinclair* v. *Jordan* (1920) 183 Cal. 486 [191 P. 910]; *Bordwell* v. *Williams* (1916) 173 Cal. 283, 286-287 [159 P. 869]; see also *Younger* v. *Jordan* (1954) 42 Cal.2d 757 [269 P.2d 616]; *Felt* v. *Waughop* (1924) 193 Cal. 498 [225 P. 862].) In *Bordwell* we issued a peremptory writ of mandate under section 6403 to compel the County Clerk of Orange County to remove from the ballot the name of a candidate who had withdrawn from the primary election. In *Younger*, involving a petition for writ of mandate or for an order under former section 2900 (now § 6403), this court while characterizing the

---

[4]"It [the writ of mandate] may be issued by any court, except a municipal or justice court, to any . . . person, to compel the performance of an act which the law specially enjoins, as a duty resulting from an office . . . ." (Code Civ. Proc., § 1085.)

proceeding as one "brought under section 2900 . . . to remove the name of another person from the ballot" (42 Cal.2d at p. 759) applied rules governing mandate in holding that the other candidate was an indispensable party upon whom service of the petition was required.

However, the Courts of Appeal in two cases have drawn a sharp distinction between relief under section 6403 and relief under the prerogative writs. (*Donnellan* v. *Hite* (1956) 139 Cal.App.2d 43 [293 P.2d 158]; *Wallace* v. *Superior Court* (1956) 141 Cal.App.2d 771 [298 P.2d 69].) In *Donnellan* the court held that relief under section 6403 was an adequate remedy at law barring mandate because there was no appeal from an order made pursuant to section 6403. In *Wallace*, relying upon *Donnellan*, the court reiterated the conclusion that an order under section 6403 was not appealable and held that certiorari lay to grant review of an erroneous superior court order made pursuant to section 6403.

Both *Donnellan* and *Wallace* are based on *Matter of Snyder* (1910) 158 Cal. 218 [110 P. 820]. In *Snyder*, a defeated candidate in a primary election sought a recount of the ballots by initiating a proceeding in the Supreme Court under section 6403. Undoubtedly haunted by the fear that all election contests would be brought here, this court dismissed the proceeding without prejudice to an original proceeding in the superior court, saying: "There is therefore nothing to justify the commencement of the proceeding in this court. Any other construction of the Primary Nomination Law would involve the most absurd results. Every contest of a close election for any county, township or municipal office throughout the state, to be effective, would have to be waged in this court . . . and the time of the court . . . would be occupied for many weeks in the merely clerical tasks of counting ballots and tallying votes." (*Id.* at p. 220.) Impelled by this legitimate concern that it might become the forum for election contests, this court emphasized its conclusion that the jurisdiction of the superior court was equally extensive in this type of proceeding, observing that "as there is no provision for an appeal in this class of contests their [the superior courts'] judgments are final when entered." (*Id.* at p. 219.)

Since election contests are now litigated in the superior courts pursuant to the elaborate procedures of division 11 of the Elections Code, we are no longer troubled by the same apprehension as the *Snyder* court and can now more comfortably examine the validity of what was there said as to the finality of orders under section 6403. It is doubtful that the above observation was accurate when made since the Code of Civil Procedure

then provided for an appeal from all final judgments entered in special proceedings. In *People* v. *Bank of San Luis Obispo* (1907) 152 Cal. 261 [92 P. 481], we had held that the general appeal provisions of the Code of Civil Procedure governed all special proceedings, even those intended to be summary in nature, unless the Legislature had specifically prohibited appeal in the statute creating the particular special proceeding. **(2)** It is still clear today that unless the statute creating the special proceeding prohibits an appeal, there is an appeal from a final judgment entered in a special proceeding. (See *In re De La O* (1963) 59 Cal.2d 128, 156 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705].) It is equally clear that a proceeding pursuant to section 6403 is a special proceeding,[5] so that an order made under that section by a superior court is appealable to a Court of Appeal, and an order made by a Court of Appeal is reviewable by this court either on its own motion or on petition for hearing. (Cal. Rules of Court, rule 28.)

Once we have dissipated the old erroneous assumption that an order entered by a superior court or Court of Appeal in a proceeding initiated under section 6403 is neither appealable nor otherwise reviewable, we find no basis for drawing a distinction between the relief pursuant to section 6403 and that available under a prerogative writ.[6] We conclude that relief sought under section 6403 is a form of relief available in a special proceeding in the nature of mandamus which should proceed through the court system according to the normal procedure prescribed and developed for such a prerogative writ.[7] To the extent that they are inconsistent with the views expressed herein, *Donnellan* v. *Hite, supra,* 139 Cal.App.2d 43, and *Wallace* v. *Superior Court, supra,* 141 Cal. App.2d 771 are hereby disapproved, and *Matter of Snyder, supra,* 158 Cal. 218 is overruled.

---

[5]It is difficult to ascertain to what "class of contests" the *Snyder* court was referring. The only class of cases we can perceive would be one denominated "special proceedings."

[6]In *Communist Party* v. *Peek* (1942) 20 Cal.2d 536, 540 [127 P.2d 889], the court distinguished between section 6403 and the traditional mandate procedure on the ground that mandate would not lie to compel the performance of future acts, whereas section 6403 reached errors, acts and duties "about to occur." Such distinction is no longer valid since mandate does now clearly lie to compel performance of future acts where it is clear that public officers do not intend to comply with their obligation when the time for performance arrives. (*Young* v. *Gnoss* (1972) 7 Cal.3d 18, 21, fn. 4 [101 Cal.Rptr. 533, 496 P.2d 445]; *Hollman* v. *Warren* (1948) 32 Cal.2d 351 [196 P.2d 562].)

[7]The Court of Appeal denied the writ of mandate and granted relief under section 6403 apparently because it thought such relief was final forthwith and nonreviewable.

In obedience to the decision of the Court of Appeal filed on April 11, 1972, the Registrar placed Sandy Knoll's name upon the ballot as candidate for the office of Supervisor of the Fifth Supervisorial District of the County of Alameda at the primary election of June 6, 1972, and included Knoll's statement of qualifications in the voter's pamphlet.[8] Thus petitioner Knoll received the relief she initially sought, namely to have her name placed upon the ballot and to have her statement of qualifications included in the voter's pamphlet. Nevertheless, she presses upon us two additional contentions raised in her petition: (1) that sections 6551 and 6554, subdivisions (d) and (e) are unconstitutional insofar as they require a candidate for a county office in a primary election to pay a filing fee; and (2) that section 10012.5 is unconstitutional insofar as it requires a candidate in a primary election to prepay a pro rata share of the printing and handling costs in order to have his statement of qualifications included in the voter's pamphlet.

Although petitioner has received the immediate relief requested with respect to the primary election of June 6, 1972, the basic constitutional issues raised by her petition are of general public interest on matters requiring uniform application of the election laws throughout the state and are therefore not moot. (*Zeilenga* v. *Nelson* (1971) 4 Cal.3d 716, 719-720 [94 Cal.Rptr. 602, 484 P.2d 578].) As we have explained, it is appropriate to employ, pursuant to section 6403, a petition in the nature of one seeking a writ of mandate in order to challenge the constitutionality of provisions of the Elections Code governing primary elections. (*Jolicoeur* v. *Mihaly, supra,* 5 Cal.3d 565, 570, fn. 2; *Communist Party* v. *Peek, supra,* 20 Cal.2d 536.)

## II

Having disposed of the procedural preliminaries, we now turn our attention to the merits. Petitioner contends that sections 6551 and 6554, subdivisions (d) and (e) insofar as they require the payment of a filing fee as a condition to becoming a candidate for a county office at a primary election are violative of the equal protection clause of the Fourteenth Amendment under the decision of the United States Supreme Court in *Bullock* v. *Carter* (1972) 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849].

In *Bullock* the high court was called upon to review the constitutionality of the Texas filing-fee system, under which the payment of a filing fee

---

[8]Petitioner Knoll was unsuccessful in her bid at the June 6, 1972, primary election to qualify for the general election.

was an absolute prerequisite to a candidate's participation in a primary election. This fee system was designed to place the full burden of financing primary elections upon the candidates. As a result, the filing fees were often very large. The three prospective candidates in *Bullock* were required to pay $1,000, $1,424.60 and $6,300 in order to be a candidate for commissioner of the general land office, county commissioner and county judge respectively. In counties with large populations the filing fees were either 10 or 15 percent of the aggregate annual salary which could run as high as $8,900; in counties with small populations, there were no such percentage limitations and the filing fees could run as high as 99.7 percent of the annual salary. However, filing fees for state offices and offices involving statewide primaries were more closely regulated and tended to be substantially smaller.

The court declared that the proper standard of review was the one of strict scrutiny applied by it in *Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079], and concluded: "Because the Texas filing-fee system has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper*, that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." (*Bullock* v. *Carter, supra,* 405 U.S. 134, 144 [31 L.Ed.2d 92, 100].)

The *Bullock* court recognized at the outset that a state has a legitimate interest in regulating the number of candidates on the ballot. However, the court held that a filing fee system, which by its nature utilizes ability to pay as the criterion for inclusion upon the ballot, is not sufficiently precise or tailored to effectuate regulation of the number of candidates on the ballot since it eliminates legitimate, serious candidates who are unable to pay the filing fee; and that such exclusion of legitimate candidates is not necessary to further this legitimate state interest, because there exists a reasonable alternative means of access to the ballot by nominating petitions.

The Registrar contends, however, that *Bullock* can and must be read to invalidate only *unreasonable* filing fees, pointing to the following language: "It must be emphasized that nothing herein is intended to cast doubt on the validity of reasonable candidate filing fees or licensing fees in other contexts." (*Bullock* v. *Carter, supra,* 405 U.S. 134, 149 [31

L.Ed.2d 92, 103].) He insists that the key invalidating ingredient in the Texas filing-fee system was not the fact that fees were required, but that the required fees were excessive in amount: "Unlike a filing-fee requirement that most candidates could be expected to fulfill from their own resources or at least through modest contributions, the very size of the fees imposed under the Texas system gives it a patently exclusionary character . . . . There is no escape from the conclusion that the imposition of filing fees ranging as high as $8,900 tends to limit the number of candidates entering the primaries." (*Id.* at pp. 143, 145 [31 L.Ed.2d at pp. 100, 101], *passim.*) Therefore, the Registrar argues, candidate fees which are reasonable in amount, are constitutionally permissible under *Bullock*, even though exclusionary.

The Registrar's contention has been clearly and unequivocally rejected by the United States Supreme Court in *Lubin* v. *Panish* (1974) 415 U.S. 709 [39 L.Ed.2d 702, 94 S.Ct. 1315] which declared unconstitutional the very California filing fee system under attack in the case at bench.[9] In *Lubin,* the petitioner, a candidate for the office of Los Angeles County Supervisor, was required by sections 6551 and 6554 to pay a filing fee of $701.60 in order to be placed on the ballot. The court noted that the fees required by the California Elections Code are fixed at a percentage (2 percent or 1 percent) of the salary for the office sought and ranged from $192 for State Assembly to $982 for Governor.

After reiterating its position in *Bullock* that the state has an interest of the highest order in keeping its "ballots of reasonable size limited to serious candidates with some prospects of public support" (415 U.S. at pp. 715, 716-719 [39 L.Ed.2d at pp. 708, 709-710]), the court went on to note that "[i]n *Bullock, supra,* we expressly rejected the validity of filing fees as the sole means of determining a candidate's 'seriousness'. . . . Filing fees, however large, do not, in and of themselves, test the genuineness of a candidacy or the extent of the voter support of an aspirant for public office. A large filing fee may serve the legitimate function of keeping ballots manageable but standing alone it is not a certain test of whether the candidacy is serious or spurious. A wealthy candidate with not the remotest chance of election may secure a place on the ballot by writing a check. Merchants and other entrepreneurs have been known to run for public office simply to make their names known to the public. We have also noted that prohibitive filing fees, such as those in *Bullock* can

---

[9]*Lubin* was decided on March 26, 1974. Since this was after oral argument in the case at bench, we requested the parties before us to submit supplemental briefs directed to the effect of *Lubin* on the present case.

effectively exclude serious candidates. Conversely, if the filing fee is more moderate, as here, impecunious but serious candidates may be prevented from running. Even in this day of high budget political campaigns some candidates have demonstrated that direct contact with thousands of voters by 'walking tours' is a route to success. Whatever may be the political mood at any given time, our tradition has been one of hospitality toward all candidates without regard to their economic status.

"The absence of any alternate means of gaining access to the ballot inevitably renders the California system exclusionary as to some aspirants. As we have noted, the payment of a fee is an absolute not an alternative condition, and failure to meet it is a disqualification from running for office. Thus, California has chosen to achieve the important and legitimate interest of maintaining the integrity of elections by means which can operate to exclude some potentially serious candidates from the ballot without providing them with any alternative means of coming before the voters. Selection of candidates solely on the basis of ability to pay a fixed fee without providing any alternative means is not reasonably necessary to the accomplishment of the State's legitimate election interests. Accordingly, we hold that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay.

"In so holding, we note that there are obvious and well known means of testing the 'seriousness' of a candidacy which do not measure the probability of attracting significant voter support solely by the neutral fact of payment of a filing fee. States may, for example, impose on minor political parties the precondition of demonstrating the existence [of] some reasonable quantum of voter support by requiring such parties to file petitions for a place on the ballot signed by a percentage of those who voted in a prior election. See *American Party of Texas* v. *White*, No. 72-887 (decided March, 1974). Similarly, a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the 'seriousness' of his candidacy by persuading a substantial number of voters to sign a petition in his behalf.[5] The point, of course, is that ballot access must be genuinely open to all subject to reasonable requirements. *Jenness* v. *Fortson*, 403 U.S. 431, 439 (1971). California's present system has not met this standard."

---

"[5]It is suggested that a write-in procedure, under § 18600 *et seq.*, without a filing fee would be an adequate alternative to California's present filing fee requirement. The realities of the electoral process, however, strongly suggest that 'access' via

The Supreme Court in *Lubin* v. *Panish, supra,* 415 U.S. 709, emphasized the importance of the state's interest in keeping its ballots of reasonable size and limited to serious candidates, and referred to such interest as being "of the highest order" (*id.* at p. 715 [39 L.Ed.2d at p. 708]), of "fundamental importance" (*id.* at p. 715 [39 L.Ed.2d at p. 708]), and an "important and legitimate" one (*id.* at p. 718 [39 L.Ed.2d at p. 709]). We would indeed do a disservice to *Lubin,* remain insensitive to its *ratio decidendi,* and all in all misread its clear message, were we to hold that the state's interest in maintaining a ballot of reasonable size must succumb to the demands of potential candidates that, on the basis of their indigency, they indiscriminately and at will be permitted a place on the ballot thereby posing the danger of impossibly long ballots. The *Lubin* court, rejecting such a state of affairs as intolerable, nevertheless indicates how the above state interest can be promoted, while preserving the indigent's right to be a candidate: "Similarly, a candidate who establishes that he cannot pay the filing fee required for a place on the primary ballot may be required to demonstrate the 'seriousness' of his candidacy by persuading a substantial number of voters to sign a petition in his behalf." (*Id.* at pp. 718-719, fn. omitted [39 L.Ed.2d at p. 710].)

As *Lubin* makes clear, the essential error of the California filing-fee system is that it relies solely and absolutely upon the payment of a fee, without providing any alternative procedures for qualifying as a candidate. Although payment of a filing fee as a condition for filing a declaration of candidacy for public office is not in and of itself unconstitutional, an election system which prescribes filing fees as the exclusive means of obtaining a place on the ballot cannot pass constitutional muster since it violates the equal protection clause of the federal Constitution. In striking down such a filing-fee system the *Lubin* court observed "that there are obvious and well known means of testing the 'seriousness' of a candidacy which do not measure the probability of attracting significant voter support solely by the neutral fact of payment of a filing fee." (*Lubin* v. *Panish, supra,* 415 U.S. at p. 718 [39 L.Ed.2d at p. 710].)

---

write-in votes falls far short of access in terms of having the name of the candidate on the ballot. It would allow an affluent candidate to put his name before the voters on the ballot by paying a filing fee while the indigent, limited by his lack of funds to reliance on the write-in provision, would be forced to rest his chances solely upon those voters who would remember his name and take the affirmative step of writing it on the ballot. That disparity would, itself, give rise to constitutional questions and, although we need not decide the issue, the intimation that a write-in provision without the filing fee required by § 18600 *et seq.* would constitute 'an acceptable alternative' appears dubious at best."

To recapitulate, we hold under the authority, indeed the compulsion, of both *Bullock* and *Lubin* that since the State of California has not provided a reasonable alternative means of access to the ballot, the filing fee system set forth in sections 6551, 6552, 6553, 6554 and 6555 of the Elections Code violates the equal protection clause of the Fourteenth Amendment to the United States Constitution and therefore is, and the aforementioned sections of the Elections Code are, in all respects null and void.[10] It is not our province to dictate what statutory system the Legislature should enact as a replacement but we emphasize that nothing that we have said herein should be deemed to preclude it from establishing a system which includes the requirement of a filing fee, so long as such system also includes a reasonable alternative means of access to the ballot, available to all candidates indigent and nonindigent alike.[11]

---

[10]We have already announced our holding in this respect in *Donovan* v. *Brown* (1974) 11 Cal.3d 571 [115 Cal.Rptr. 41, 524 P.2d 137]. In that case we rejected the contention of the respondents that the filing fee requirements were unconstitutional *only* as to indigents.

[11]The Legislature, in direct response to *Lubin,* has already enacted an alternative means of access to the ballot by providing that a candidate may submit a petition containing a specified number of signatures of registered voters in lieu of a filing fee for all elective offices. (Stats. 1974, ch. 454, amending Elec. Code, §§ 6555 and 18603 and adding Gov. Code, § 16100.6, effective July 11, 1974.) We express no opinion as to the constitutionality of the new filing fee system effective July 11, 1974.

The act provides in pertinent part as follows:

"The people of the State of California do enact as follows:

"Section 1. Section 6555 of the Elections Code is amended to read:

"6555. (a) Notwithstanding any other provision of this article, a candidate may submit a petition containing signatures of registered voters in lieu of a filing fee as follows:

"(1) For the office of California State Assembly, 1,500 signatures.

"(2) For the office of California State Senate and the United States House of Representatives, 3,000 signatures.

"(3) For candidates running for statewide office, 10,000 signatures.

"(4) For all other offices for which a filing fee is required, if the number of registered voters in the district in which he seeks nomination is 2,000 or more, a candidate may submit a petition containing four signatures of registered voters for each dollar of the filing fee, or 10 percent of the total of registered voters in the district in which he seeks nomination, whichever is less.

"(5) For all other offices for which a filing fee is required, if the number of registered voters in the district in which he seeks nomination is less than 2,000, a candidate may submit a petition containing four signatures of registered voters for each dollar of the filing fee, or 20 percent of the total of registered voters in the district in which he seeks nomination, whichever is less.

"(6) Notwithstanding any other provision of this section, a candidate seeking the nomination of a qualified party with whom he is registered, the registered voters of which who were eligible to vote at the last statewide election constituted less than 5

## III

■ Finally we turn to petitioner Knoll's contentions with respect to the constitutionality of section 10012.5[12] as applied by the Registrar. That section permits a candidate for local office in a primary election to submit a 200-word nonpartisan statement of qualifications, directs the county

percent of all registered voters eligible to vote at the last statewide election, may submit a petition containing signatures of 10 percent of the registered voters of that party in the district in which he seeks nomination, or 150 signatures, whichever is less.

"(b) Each clerk shall furnish to each candidate, upon request, and without charge therefore, forms for securing signatures. Such forms shall be made available commencing 30 days before the first day for circulating nomination papers. The substitution of signatures for fees shall be subject to the following provisions:

"(1) Any voter registered as affiliated with the same political party as a candidate for whom he is eligible to vote may sign the petition of that candidate, and any registered voter may sign the petition of a candidate, other than a candidate seeking the nomination of his party, for whom he is eligible to vote regardless of political party.

"(2) No voter shall at the time of signing a petition have his name signed to any other petition for any other candidate for the same office, or, in case there is more than one place to be filled in the same office, signed to more petitions for candidates for that office than there are places to be filled.

"(3) A candidate may submit the appropriate number of signatures to cover all or any pro rata portion of the filing fee.

"(4) Upon receipt of signatures, the clerk shall issue nomination papers provisionally, subject to checking the validity of the signatures against the affidavits of registration on file in his office. In the event that upon checking, the number of valid signatures falls below the number required, the clerk shall notify the candidate of the fact and shall accept any necessary signatures at any time prior to the close of the period for circulating nomination papers.

"(5) Each candidate may submit a greater number of signatures to allow for subsequent losses due to invalidity of some signatures. The clerk shall not be required to determine the validity of a greater number of signatures than that required by this section.

"SEC. 2. Section 18603 of the Elections Code is amended to read:

"18603. No name written upon a ballot in any state, county, city, city and county, or district election shall be counted for an office or nomination unless a declaration has been filed pursuant to Sections 18601 and 18602 declaring a write-in candidacy for that particular person for that particular office or nomination.

". . . . . . . . . . . . . . . .

"SEC. 5. This act is an urgency statute necessary for the immediate preservation of the public peace, health, or safety within the meaning of Article IV of the Constitution and shall go into immediate effect. The facts constituting such necessity are:

"In order to comply with current judicial decisions invalidating certain filing fee requirements, it is necessary that this act take effect immediately."

[12]Section 10012.5 provides in relevant part: "Each candidate for elective office in any local agency, city, county, city and county or district may prepare a statement of qualifications on an appropriate form provided by the clerk. Such statement may

clerk to send a voter's pamphlet containing these statements of qualifications along with the sample ballot, and permits the local agency to bill each candidate who submits a statement of qualifications for his share of the actual prorated costs of printing and handling.

The County of Alameda in order to insure collection of the costs, initiated a system, whereby each candidate at the time he filed his nomination papers and submitted his statement of qualifications, was required to *prepay* a deposit equal to his pro rata share of the estimated costs of printing and handling the statement of qualifications. If the candidate was unable to pay the required deposit, the Registrar refused to accept the statement of qualifications and refused to print it in the voter's pamphlet.

The Alameda County Board of Supervisors estimated the costs of printing and handling statements of qualifications on the basis of the office being sought and instituted by resolution a schedule of fees which each candidate for each office must prepay in order to have his statement of qualifications included in the voter's pamphlet. The Registrar contends that pursuant to Resolution No. 142154 of the Alameda County Board of Supervisors, adopted January 18, 1972, he was entitled to collect $497.90 from petitioner Knoll before he was required to accept and print her statement of qualifications in the voter's pamphlet.

Petitioner avers that she was unable to pay this amount and contends that the Alameda County prepayment system invidiously discriminates against poor candidates in violation of the equal protection clause of the Fourteenth Amendment to the United States Constitution. It appears clear that the county need not be compelled to pay the cost of providing this service of printing and mailing candidates' statements of qualifications and that, as indicated in *Bullock,* the county has a legitimate state interest in collecting the actual cost of providing such a service. However, it appears

include the name, age and occupation of the candidate and a brief description of no more than 200 words, of the candidate's education and qualifications expressed by the candidate himself. Such statement shall not include the party affiliation of the candidate, nor membership or activity in partisan political organizations. Such statement shall be filed in the office of the clerk when his nomination papers are returned for filing, if it is for a primary election. . . .

"The clerk shall send to each voter together with the sample ballot, a voter's pamphlet which contains the written statements of each candidate's qualifications that is prepared pursuant to this section. . . .

"The local agency may bill each candidate availing himself of these services a sum not greater than the actual prorated costs of printing, handling, and translating, if any, incurred by the agency as a result of providing this service. Only those charges may be levied and each candidate using these services shall be charged the same."

equally clear that the county cannot constitutionally make this service available only to affluent candidates, while denying it to less affluent ones. (See *Douglas* v. *California* (1963) 372 U.S. 353 [9 L.Ed.2d 811, 83 S.Ct. 814]; *Griffin* v. *Illinois* (1956) 351 U.S. 12 [100 L.Ed. 891, 76 S.Ct. 585, 55 A.L.R.2d 1055]; cf. *Boddie* v. *Connecticut* (1971) 401 U.S. 371 [28 L.Ed.2d 113, 91 S.Ct. 780].)

The voter's pamphlet, which accompanies the sample ballot, purports to be an authoritative document that appears to give an imprimatur of official approval to statements of qualifications included therein. It is quite likely that this document would carry greater weight in the minds of the voters than normal campaign literature and that candidates who do not have their statements of qualifications in it would appear to be lacking in official sanction. In short, it seems likely that candidates who have their statements of qualifications included in the voter's pamphlet have a clear advantage over candidates who do not.

It is impermissible for the state or local agency involved to deny this opportunity solely on the basis of wealth, thereby giving an unfair advantage to the affluent and invidiously discriminating against those unable to afford the substantial fees. Therefore in the present case the county cannot constitutionally require that a candidate pay a fee equal to his pro rata share of the printing and handling costs as a condition to having his statement of qualifications included in the voter's pamphlet.

However, we do not deem it necessary to strike down section 10012.5, because, as we read the statute, it does not authorize such a prepayment system, but only permits the county to subsequently bill the actual cost of providing the services once the services contemplated by the statute have been provided. Section 10012.5 nowhere authorizes the local agency to make payment of the actual cost of providing the service a prerequisite to inclusion of the statement of qualifications. Nowhere does it compel the local agency to collect the actual cost. Nor does it authorize the local agency to collect the estimated cost of providing the service. The section merely provides that the "local agency *may bill* each candidate availing himself of these services a sum not greater than the *actual* prorated costs of printing, handling, and translating, if any, *incurred* by the agency *as a result of providing this service.*" (Italics added.) Moreover, the section, except with respect to the content and length of the statement of qualifications, does not confer discretion upon the local agency with respect to the inclusion of the statement of qualifications, but rather says: "The clerk *shall* send to each voter together with the sample ballot, a voter's pamphlet

which contains the written statements of each candidate's qualifications that is prepared pursuant to this section." (Italics added.)

We hold that section 10012.5 *compels* the local agency to include in the voter's pamphlet each candidate's statement of qualifications which conforms to the statutory standards with respect to content and length and *permits* the local agency to bill, at its option, each candidate, who has had a statement of qualifications included in the pamphlet, for his pro rata share of the actual costs of printing and handling, after the voter's pamphlet has been printed and distributed.

The petition for relief under section 6403 is denied as moot.

Wright, C. J., and Tobriner, J., concurred.

**MOSK, J.**—I concur.

I agree fully with points I and III of the majority opinion. On point II, I would have joined Justice Burke in dissent but for the occurrence of subsequent events which have rendered that issue moot. As indicated in footnote 11 of the majority opinion, the Legislature has now provided methods alternative to the payment of fees for the qualification of candidates for public office.

**BURKE, J.**—I dissent to part II of the majority opinion on two grounds. First, as Justice Mosk points out in his concurring opinion, the issue explored in part II is now wholly moot. The Legislature has enacted provisions (see fn. 11, *ante,* p. 349, of the "majority"[1] opinion) designed to afford indigent candidates an alternative means of access to the ballot. These provisions, which are presently in effect, make it unnecessary to discuss the constitutionality of the former, repealed system whereby all candidates for public office were required to pay a fee for the privilege of appearing on the ballot. As the majority point out, petitioner Knoll long ago obtained the relief she sought and only the importance of the constitutionality issue would justify our speaking to that issue. That issue is now moot and, accordingly, I believe we are not warranted to explore the issue in our opinion.

Nevertheless, since the majority choose to address the issue, I am impelled to point out what I believe is a major shortcoming in their analysis.

[1] I use the term "majority" opinion guardedly, for of the six justices sitting in this case, only three concur on the merits of part II of the opinion.

The majority assert that the former filing fee system was "null and void" in its entirety, even as to candidates who could afford the required fees. (See *Donovan* v. *Brown,* 11 Cal.3d 571, 573 [115 Cal.Rptr. 41, 524 P.2d 137].) Yet analysis of the leading cases by the United States Supreme Court makes it clear that California's system was only partially invalid. Both *Bullock* v. *Carter,* 405 U.S. 134 [31 L.Ed.2d 92, 92 S.Ct. 849], and *Lubin* v. *Panish,* 415 U.S. 709 [39 L.Ed.2d 702, 94 S.Ct. 1315], struck down filing fee systems for the sole and express reason that such systems improperly deprived *indigents* of their right to run for public office. As stated in *Lubin* (p. 718 [39 L.Ed.2d p. 710]), "we hold that in the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay."

Thus, as applied to candidates who *can* afford the filing fees, the fee provisions at issue unquestionably pass constitutional scrutiny; the fee system was invalid only as applied to indigent candidates. Yet, under the majority's reasoning, even the richest candidate was excused from paying these fees. This approach seems wholly unjustified by the cases referred to above.

In any event, it should be emphasized that the majority's holding on this issue relates solely to a fee system no longer operable in this state. By reason of the new legislation referred to above, indigent candidates (and others) now have an alternative means of appearing on the ballot, by filing a nominating petition containing the requisite number of signatures. Since payment of a filing fee no longer represents the sole means of access to the ballot, it would appear that the objections raised in *Bullock* and *Lubin* are satisfied and the fee provisions held invalid by the majority may now operate as intended.

McComb, J., concurred.

On September 12, 1974, the opinion was modified to read as printed above.