[Civ. No. 59097. Second Dist., Div. Two. May 22, 1980.]

MALCOLM H. MACKEY, Petitioner, v.
LEONARD PANISH, as Registrar-Recorder, etc., et al., Respondents;
JOHN R. STANTON et al., Real Parties in Interest.

[Civ. No. 59136. Second Dist., Div. Two. May 22, 1980.]

MALCOLM H. MACKEY et al., Petitioners, v.
LEONARD PANISH, as Registrar-Recorder, etc., et al., Respondents;
JOHN R. STANTON et al., Real Parties in Interest.

8

COUNSEL

Bonelli, Wood & Heib, Robert Most and Stanley Sapiro for Petitioners.

John H. Larson, County Counsel, and David L. Muir, Deputy County Counsel, for Respondents.

Lawler, Felix & Hall, F. John Nyhan and Paul M. Harrigan for Real Parties in Interest.

OPINION

**COMPTON, J.**—Malcolm H. Mackey is a judge of the Municipal Court of the Los Angeles Judicial District. He also is presently a candidate for election to office number three of the Superior Court of Los Angeles County. The primary election for that office is to be held on June 3, 1980.

On April 3, 1980, Judge Mackey filed a petition for a writ of mandate in the Supreme Court of California. By that petition he sought an order directed to the Registrar of Voters of Los Angeles County requiring the latter to print and mail Judge Mackey's "candidate's statement" which statement is authorized by Elections Code section 10012.

Judge Mackey alleged that the registrar had refused to accept his "candidate's statement" without prepayment of the sum of $17,000. The registrar, in demanding prepayment, relied on the provisions of Elections Code section 10012 which authorizes a local agency to establish a prepayment requirement based on an estimate of the cost of preparing such statement.

The petition for mandate attacks the constitutionality of both the prepayment requirement and the amount of the charges.

On April 10, 1980, the Supreme Court transferred Judge Mackey's petition to this court in an order as follows:

"The above-entitled petition for writ of mandamus is transferred to the Court of Appeal, Second Appellate District, with directions to issue an alternative writ of mandamus to be heard before that court when the proceeding is ordered on calendar.

"Pending determination of proceedings herein, it is ordered that respondents refrain from implementing those provisions of section 10012 of the Elections Code which permit respondents to require payment of prorated costs in advance as a condition of having candidates statements included in voter's pamphlet."

On April 18, 1980, Judge Mackey filed in this court a new petition for a writ of mandate. In this petition he was joined by Milton Most, a commissioner of the Superior Court of Los Angeles County. Commissioner Most is a candidate for election to office number 64 of the Superior Court of Los Angeles County.

This latest petition seeks the same relief as that sought in the original petition to the Supreme Court but contains the additional information that the registrar has refused to comply with the second paragraph of the Supreme Court's order of transfer. The registrar's refusal in this latter regard was predicated on the fact that the deadline for filing the

"candidate's statement" was March 7, 1980.[1] We issued an order to show cause and calendared both petitions for oral argument.

Responses to the petition were filed on behalf of the registrar and on behalf of three candidates for judicial office who have paid the fee as demanded by the registrar and have otherwise qualified under the statute to have their statements prepared and mailed. All of these responses defend the constitutionality of the statutory scheme and further contend that to grant the relief sought by the petitioners would be unfair to those candidates who have complied with the statute and because of the shortage of time would disrupt the election process.

In our view this dispute has two phases: (1) resolution of the merits of petitioners' claim of unconstitutionality, which claim is based upon the Supreme Court's holding in *Knoll* v. *Davidson* (1974) 12 Cal.3d 335 [116 Cal.Rptr. 97, 525 P.2d 1273], and *East Bay Municipal Utility Dist.* v. *Appellate Department* (1979) 23 Cal.3d 839 [153 Cal.Rptr. 597, 591 P.2d 1249]; and (2) compliance with the Supreme Court's order of April 10, 1980.

In *Knoll* v. *Davidson, supra,* filed in 1974, the California Supreme Court dealt with an attack on the constitutionality of a procedure adopted in Alameda County for implementing Elections Code section 10012.5 (now Elec. Code, § 10012). That procedure required a candidate to prepay the estimated cost of preparing and mailing a "candidate's statement."

The statute as it was then worded contained no provision for such prepayment but only a provision that the local agency could "bill" the candidate for his share of the costs. The *Knoll* court, in striking down the prepayment requirement, observed that there was no statutory basis therefor. More importantly, however, the court also stated at page 352: "It is impermissible for the state or local agency involved to deny this opportunity solely on the basis of wealth, thereby giving an unfair advantage to the affluent and invidiously discriminating against *those unable to afford* the *substantial fees.* Therefore in the present case the county cannot constitutionally require that a candidate pay a fee equal to his pro rata share of the printing and handling costs as a condition to having his statement of qualifications included in the voter's pamphlet." (Italics added.)

---

[1] Elections Code section 10012 provides in part: "Such statement shall be filed... when [the candidate's] nomination papers are returned for filing...."

In 1979, the court in *East Bay Municipal Utility Dist.* v. *Appellate Department* (1979) 23 Cal.3d 839 [153 Cal.Rptr. 597, 591 P.2d 1249], addressed another phase of the problem, i.e., that of the county's right to collect the charges after the candidate's statement had been mailed. Since the election at issue had occurred in 1974, the court there again dealt with Elections Code section 10012.5. The court expressly reaffirmed its holding in *Knoll* v. *Davidson, supra,* concerning the requirement of prepayment but held that it was constitutionally permissible for the county to resort to the courts to enforce later collection of the charges.

Present Elections Code section 10012 was enacted in 1978, and replaced the former 10012.5. Significant here is the fact that the new statute contained the following language. "The local agency may estimate the total cost of printing, handling, translating, and mailing the candidate's statements filed pursuant to this section, *and may require each candidate filing a statement to pay in advance* to the local agency his or her pro rata share as a condition of having his or her statement included in the voter's pamphlet." (Italics added.)

Relying on that language the Board of Supervisors of Los Angeles County adopted a resolution on September 4, 1979, requiring prepayment of the costs in Los Angeles County. The Registrar of Voters for Los Angeles County in turn adopted a procedure whereby a candidate could avoid the prepayment requirement by executing an "affidavit of indigency."

Petitioners have not executed that affidavit. They contend that the registrar did not advise them of the availability of such a procedure. In any event it would appear that petitioners are not "indigent" as that term is commonly understood.[2]

■ Thus we are, in these petitions, asked to strike down as unconstitutional a statute and a local procedure and thereby *require* local agencies to extend credit to nonindigents for a portion of their campaign cost. This, we are told, is necessary to insure a "free" election untainted by the advantages of wealth. In this regard we find ourselves in agreement with the language of the Supreme Court in *East Bay, su-*

---

[2]Indigency is defined in Webster's New Collegiate Dictionary (7th ed.) as "impoverished," "needy," "totally lacking in something specified." We take judicial notice of the fact that a municipal court judge receives an annual salary of $49,872, and a superior court commissioner receives a salary of $46,074 per annum.

*pra,* at page 845, the concept of "[a] 'free election' does not mandate a free ride from all election campaign expense...."

We are loath simply to adopt the device of declaring a statute unconstitutional because it denies someone equal protection of the law, a device too facilely employed by some courts in attempting to correct what they perceive as an inequality.

When this approach is too lightly and frequently adopted in setting at naught an enactment of the Legislature, the result is generally to replace one form of inequality with another and what is worse, by grounding the ruling on a constitutional basis, to place the matter beyond future legislative reach.

In our opinion, neither *Knoll* nor *East Bay*, which merely repeated, without additional analysis, the statement made in *Knoll*, compels the extension of credit to nonindigents who aspire to elective office.

*Knoll* involved both the payment of a filing fee and prepayment for the "candidate's statement." *Knoll* was an indigent, hence the case of the nonindigent was not before the court. Since *Knoll*, the indigency issue in the case of filing fees has been legislatively resolved.[3]

In enacting Elections Code section 10012, the Legislature acted to correct what it understood to be the deficiency in the former statute which was highlighted in *Knoll, supra*, to wit, the lack of express authorization for prepayment. The procedure adopted in Los Angeles County effectively solves the indigency problem. We deal with a statute and a local procedure which were not at issue in *Knoll*, hence *Knoll* is not controlling.

We are aware that $17,000 is a substantial sum of money and we assume that in the other large counties the fees are also substantial. As a consequence there may be worthy candidates who are unable or unwilling to raise such sums.

That may be a policy matter of concern to the Legislature but it is not a sufficient basis for declaring a legislative enactment to be in violation of the Constitution, nor is it a cogent reason for requiring a local agency to subsidize or extend credit to a nonindigent for what is essen-

---

[3]Elections Code section 6555, now permits the filing of a petition containing voter signatures in lieu of a filing fee.

tially a campaign expense when other forms of campaign promotion cannot be so financed. We find that the present statute and the procedure in Los Angeles County meet constitutional requirements.

We now turn to the issue of the Supreme Court's order in the instant case. In our opinion that order can only be interpreted one way, and that is, that the registrar was directed to accept, prepare and mail "candidate's statements" without prepayment of the estimated cost. The Supreme Court obviously intended that petitioners should not be forced to stand election without the benefit of having their qualifications presented to the voters by this method pending our decision on the merits of the petition.

We recap the chronology of events: (1) March 7, 1980, was a date for filing the "candidate's statement;" (2) on that date and prior thereto, the registrar declared that he would refuse to accept the "candidate's statement" for filing from candidates for the superior court without the prepayment of the sum of $17,000; (3) on April 10, 1980, the Supreme Court ordered the registrar to refrain from implementing that requirement; (4) on April 16 and 17, petitioners Mackey and Most, respectively, submitted their "candidate's statements" to the registrar; (5) the registrar immediately rejected the statements on the grounds that March 7, 1980, was the deadline for filing—all reminiscent of "Catch 22."

Since the Supreme Court order was issued after March 7, 1980, and the registrar had previously refused to accept "candidate's statements" for filing and without prepayment of the costs, the March 7, 1980, deadline was no basis for his refusing at this time to comply with the Supreme Court order. It appears to us that the registrar of voters may well be in contempt of the order of the Supreme Court. We strongly disapprove of his conduct.

On the other hand, we are told that as of this writing, 99 percent of the "candidate's statements" have been mailed, along with the sample ballots and that a number of absentee ballots have already been returned. Projected additional costs of mailing of petitioners' "candidate's statements" along with those of persons similarly situated, would be approximately $1.6 million. To now force the registrar to comply with the Supreme Court order would substantially disrupt the election process and would be unfair to those candidates who have previously paid their share of the costs, thus committing a substantial portion of their cam-

paign resources to that purpose, which resources might have been used by them in other activities. Further, we cannot overlook the increased importance which voters might attach to a statement of qualification which arrives by special mailing almost on the eve of the election.

In short, the registrar, by his obdurate stance in the face of a clear order by the Supreme Court of California, effectively thwarted any relief to which petitioners might have been entitled.

On the other hand, since this is an equitable proceeding, we must balance the registrar's conduct against that of the petitioners themselves. It appears that to a degree petitioners must bear part of the blame for their predicament. From the chronology of events it appears that petitioner Mackey waited almost 30 days after the deadline for filing the "candidate's statement" before he sought relief in the Supreme Court.

Secondly, after the Supreme Court issued its order on April 10, 1980, both petitioners waited approximately one week before submitting their "candidate's statements" to the registrar. Though their petition to this court followed only one day after the registrar's refusal to accept their statements, they have presented us with no satisfactory explanation why they did not proceed earlier than two months before the election. The statute in issue was enacted in 1975, and the Los Angeles County Board of Supervisors adopted its resolution as early as September 4, 1979.

The petitions are denied.

The parties to bear their own costs.

Fleming, Acting P. J., and Beach, J., concurred.