[S. F. No. 18596. In Bank. July 11, 1952.]

MARVIN HANDLER, Appellant, v. BOARD OF SUPERVISORS OF THE COUNTY OF SAN MATEO et al., Respondents.

Paul A. McCarthy and Howard Magee for Appellant.

Louis B. DeMatteis, District Attorney, Keith C. Sorensen and John A. Bruning, Assistant District Attorneys, for Respondents.

CARTER, J.—Plaintiff petitioned for a writ of mandate to compel the controller of San Mateo County to draw a warrant for payment of his claim for $1,500, which had been approved by the board of supervisors. An alternate

writ was issued and respondents, as their return thereto, demurred generally to the petition. ■ The matter was argued on questions of law and submitted to the court which rendered judgment that petitioner take nothing and that the alternative writ be dismissed. Under these circumstances the allegations of the petition must be accepted as true. (*Merchants Serv. Co.* v. *Small Claims Court,* 35 Cal.2d 109, 110 [216 P.2d 846]; *Kennedy* v. *Ross,* 28 Cal.2d 569, 571 [170 P.2d 904]; 16 Cal.Jur. 866 et seq.)

According to the petition, plaintiff is an attorney admitted to practice in California and has been specializing for 15 years in public utility rate regulation. The Southern Pacific Company operates passenger trains between San Francisco and San Jose and way points in San Mateo County. It applied to the Public Utilities Commission for an increase in passenger fares on such trains. Commuters in San Mateo County formed an association which employed plaintiff to represent them to resist the application before the commission. Plaintiff arranged with Fred Chestnut, a traffic engineer, to assist him. The proceeding is now, and has been since 1949, pending before the commission and plaintiff has been performing the services for which he was employed. On November 25, 1949, the board of supervisors of the county at a meeting "agreed to employ" plaintiff and Chestnut as "special assistants to the District Attorney" and to appropriate up to $2,000 toward their compensation for services in opposing the rate increases if proportionate amounts were appropriated by the municipalities and contributed by the commuters in the county. The funds from other sources were obtained and on June 20, 1950, the board adopted a resolution by a four to nothing vote (there was one vacancy), wherein it was declared that the fare increase would be detrimental to the general welfare of the county and it is to the best interest of the county to oppose the increase. Therefore, $1,500 is transferred from the unbudgeted reserves to the "Advertising Budget, Maintenance and Operation, Promotional Requests—Various and Sundries Appropriation" to be used to employ plaintiff and Chestnut as special assistants to the district attorney to oppose the increase. On June 30, 1950, plaintiff presented a verified claim to the board for the $1,500. It was approved and ordered paid. Thereafter, the county controller refused to approve the claim and the instant action followed.

The sole contention made by the controller is that the

county has no authority to expend money for the employment of a person to oppose the increase in rates of a public utility. At the argument in the District Court of Appeal it was suggested that specialists could not be employed except by ordinance. In a letter to the District Court of Appeal thereafter in that connection, counsel for the controller stated that he did not question the power of the board to employ specialists by resolution; he contended only that the county funds could not be used to oppose an increase in utility rates. The District Court of Appeal nevertheless based its decision on both grounds and both will be discussed.

San Mateo has a charter adopted in 1933 pursuant to the Constitution (Cal. Const., art. XI, § 7½) and approved by the Legislature (Stats. 1933, p. 2953). It has been amended from time to time. Pertinent provisions relating to employment are that the board of supervisors has the power given to it by the Constitution, charter and "general laws of the state." (Charter, art. III, § 1.) In addition to other powers it has the power to appoint appointive officers whose appointments are not otherwise provided for in the charter; to confirm appointments of officers appointed by the county manager (formerly county executive, changed by Stats. 1949, p. 2938); to provide by ordinance for the compensation of appointive officers; "To provide, by ordinance, and therein to fix and regulate, the appointment and number of assistants, deputies, clerks, attachés, and other persons to be employed, from time to time, in the several offices of the county, and therein to prescribe and regulate the powers, duties, qualifications and compensation of such persons, the times at which, and the terms for which, they shall be appointed, and the manner of their appointment and removal; provided, however, that the provisions of such ordinance or ordinances, so to be enacted by the Board of Supervisors, shall in all respects conform to and comply with all other provisions of this Charter with respect to the manner and method of appointment and removal of such assistants, deputies, clerks, attachés and other employees, their powers, duties, qualifications, compensation, the times of their appointment and the terms for which they shall be appointed." (Stats. 1943, p. 3147.) To provide by ordinance for other officers recommended by the county manager; to provide for the creation of offices hereafter created by the Constitution or general law. (Art. III, § 2.)

The general law provides: "The board of supervisors may contract with and employ any person for the furnishing to the county, or for and on behalf of any district within the county for furnishing to the district, of special services and advice in financial, economic, accounting, engineering, legal, or administrative matters by any persons specially trained and experienced and who is competent to perform the special services required. The board may pay from any available funds such compensation to any such expert as it deems proper for the services rendered." (Gov. Code, § 31000.) There is also a provision, particularly directed to legal matters: "The board of supervisors of any county not having a charter which creates the office of county counsel may employ and contract with counsel to assist the district attorney in representing and advising it and all district officers in all matters and questions of law pertaining to their duties and to civil legal questions affecting the county or districts." (Gov. Code, § 31001.)

█ The general law, *supra*, which, as seen, the charter expressly makes applicable, clearly gives authority to the board to contract with or employ plaintiff and Chestnut as the furnishers of special services. Moreover, in this connection, it should be observed that the charter authorizes the county manager to employ, with the approval of the board, "experts and consultants to perform work and advise in connection with any of the functions of the county when economically advantageous." (Art. V, § 2[f].) (See *Kennedy* v. *Ross, supra,* 28 Cal.2d 569.) While it was not alleged that the employment and appropriation here was approved by the county manager, it is so stated in plaintiff's brief and not denied by defendants.

█ It is equally clear that the employment of such specialists for the performance of special services need not be by ordinance, as distinguished from a resolution. The charter provisions heretofore discussed, which refer to action by ordinance, deal with officers and regular employees, deputies and assistants and it is regulating their duties, compensation, etc., that the board acts by ordinance. █ Persons performing specialized expert services do so on a temporary basis and are neither officers nor employees, nor do they hold a position with the county. They are more akin to independent contractors. Similar services were considered by this court in *Kennedy* v. *Ross, supra,* 28 Cal.2d 569, where we were considering whether a contract to engage an archi-

tect for a special task required an exemption from civil service laws by the Civil Service Commission. We said (p. 572): "Under the contract, the petitioner was not appointed to nor does he hold a position in any department or office of the city. The contract calls for his expert professional services on other than a permanent basis, but it does not follow that he is thereby employed in a position in any department of the city. The fact is otherwise. No position, temporary or permanent, in any department, was thereby created as contemplated by section 143 of the charter. The petitioner was engaged to do a specific expert professional task for a stated consideration. 'Positions' in 'departments and offices' of the city connote an employment to render services at a salary paid periodically and are governed by the salary standardization and related provisions of the charter, also invoked by the respondent." (See *San Francisco* v. *Boyd,* 17 Cal.2d 606 [110 P.2d 1036].) It is true that plaintiff was referred to as a special assistant to the district attorney, but we do not think that took him out of the category considered in the Kennedy case.

To determine the legality of the expenditure for plaintiff's compensation for opposing the rate increases before the commission it is necessary to apply pertinent principles. As we have above seen, the charter and general laws contemplate the employment of specialists for aiding the county in the performance of its functions. The charter also provides: "The County Manager shall have plenary power, subject to the provisions of general laws, with respect to advertising or exploiting the resources of the County. He shall, ex-officio, act as secretary of any County board of trade or County chamber of commerce created under the provisions of the general laws, and in the event of the disestablishment of any such County board of trade or County chamber of commerce, he shall perform the duties and functions customarily performed by the secretary of such County board of trade or chamber of commerce. He shall consult with the Board of Supervisors with respect to any appropriations made by the Board of Supervisors for advertising or exploiting such resources. Any appropriation made by said Board of Supervisors shall be upon the recommendation of the County Manager." (Art. V, § 3.) He also has power "to employ, by and with the approval of the Board of Supervisors, experts and consultants to perform work and advise, in connection with any of the functions of the County, when economically

advantageous.'' (Art. V, § 2[f].) The general law provides: ''The board of supervisors may levy a . . . tax . . . for the purpose of inducing immigration to, and increasing the trade and commerce of, the county. The proceeds of the tax may be expended for any or all of the following uses: (a) Advertising, exploiting, and making known the resources of the county. (b) Exhibiting or advertising the agricultural, horticultural, viticultural, mineral, industrial, commercial, climatic, educational, recreational, artistic, musical, cultural, and other resources or advantages of the county. (c) Making plans and arrangements for a world's fair, trade fair, or other fair or exposition at which such resources may be exhibited. (d) Doing any of such work in cooperation with or jointly by contract with other agencies, associations, or corporations.'' (Gov. Code, § 26100.) Other laws have contemplated that the counties may have an interest in the rates of utilities operating therein. ■ The public utility law provides that complaint may be made to the Public Utilities Commission by any ''body politic'' or ''municipal corporation'' as well as others concerning the rates charged by any public utility (Pub. Utilities Code, § 1702.) This provision of the public utilities law clearly authorizes the county to appear in rate regulation proceedings before the Public Utilities Commission. (See *Inter-State Water Co.* v. *City of Danville*, 379 Ill. 41 [39 N.E.2d 356].) The Public Utilities Act does not purport to restrict such complaints to patrons of the utility and the language of the above cited section clearly indicates that a ''body politic'' may act on behalf of its inhabitants in the prosecution of such complaints. Certainly, the rates charged by the only railroad traversing a county has a bearing upon the trade and commerce affecting the county and whether people will choose to make it their home. Also, exploitation of the resources of the county can be made more effective depending upon the rates of the carriers operating therein. Apparently the board considered that such objects would be advanced. ■ Where a substantial portion of the residents or prospective residents are affected, the county has a public interest in affording them protection. In speaking of public interest in the operation of a municipality in another connection it was said, quoting from *Green* v. *Frazier*, 253 U.S. 233 [40 S.Ct. 499, 64 L.Ed. 878] : ''What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a

'private' purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, section 176, 'Necessity alone is not the test by which the limits of state authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happenings and prosperity to the people': Cooley, Justice, in *People* v. *Salem,* 20 Mich. 452 [4 Am.Rep. 400].'' (*City of Oakland* v. *Williams,* 206 Cal. 315, 332 [274 P. 329].) In *City of Birmingham* v. *Wilkinson,* 239 Ala. 199 [194 So. 548], the court held it to be a proper expenditure to employ counsel to appear before the public service commission to obtain better telephone rates as it was for the welfare of the city. (Contra, *City of Purcell* v. *Wadlington,* 43 Okla. 728 [144 P. 380].)

Taking into consideration all the foregoing provisions of the general law, charter and legal principles we believe it may be properly said that the county has the power to expend money for the purpose here present.

There being adequate authority for the employment of petitioner and the expenditure of public money for the purpose for which he was employed, the court should have ordered the issuance of the writ.

The judgment is reversed.

Traynor, J., Schauer, J., and Spence, J., concurred.