[Civ. No. 47998. First Dist., Div. Two. Oct. 19, 1982.]

EARL DARLEY, Plaintiff and Appellant, v.
JOHN M. WARD, as Supervisor, etc., et al.,
Defendants and Respondents.

COUNSEL

Brian W. Newcomb, Carl L. McConnell and Peter H. Reid for Plaintiff and Appellant.

Keith C. Sorenson, District Attorney, L. M. Summey, Assistant District Attorney, and Gregory J. Antone, Deputy District Attorney, for Defendants and Respondents.

OPINION

**SMITH, J.**—This is an appeal from a judgment denying appellant's petition for a writ of mandate and request for injunctive relief and granting declaratory relief in favor of respondents.

Appellant, Earl Darley, by way of a taxpayer's action, sought a declaration that two contracts executed by respondent, San Mateo County, with National Medical Enterprises, Inc. for the provision of management services at two county health facilities were void because entered into without compliance with sections 1442 and 1442.5 of the Health and Safety Code and sections 31000 and 53060 of the Government Code. In addition, appellant sought a peremptory writ of mandate commanding respondents, the San Mateo Board of Supervisors, to set aside their decision to implement and execute the contracts and to provide notice and conduct hearings in accordance with Health and Safety Code sections 1442 and 1442.5. Appellant also sought injunctive relief restraining respondents "from transferring management or executing, implementing, enforcing or performing the . . . contracts . . . with National Medical Enterprises, Inc."[1]

Appellant maintains that: 1) respondents transferred the management of the health facilities in question and therefore had to comply with the requirements of Health and Safety Code sections 1442 and 1442.5; 2) respondents' failure to comply with the requirements of Government Code sections 31000 and 53060 renders the management contracts void; and 3) the trial court's failure to render adequate findings on the issue of special services constitutes reversible error.

We reject these contentions and affirm the judgment.

### FACTUAL AND PROCEDURAL STATEMENT

A. *The contracts*

The dispute in the instant case concerns two contracts executed on July 26, 1977, by the County of San Mateo (hereinafter the county) with National Medical Enterprises, Inc. (hereinafter N.M.E.) for the provision of management services at two county health facilities, Chope Hospital and Crystal Springs Rehabilitation Center, at a cost of $380,000.

The agreements, which were for the term of one year commencing on August 1, 1977, provided in relevant part as follows:

---

[1]Appellant also alleged that the subject contracts were executed in violation of the public bidding requirements of Government Code sections 54516.2 and 54516.3. Compliance with these sections are not at issue in this appeal.

"Subject to the ultimate direction and authority of the County Board of Supervisors and the Director of Public Health and Welfare of County, hereinafter referred to as 'Director', and, where appropriate, the Director of General Services, Contractor shall provide to and perform for County, management services, and consultation and advice concerning the operation of Center as more particularly set forth below . . .

"Any other provisions in this contract to the contrary notwithstanding, it is the intent of the parties hereto that Contractor, in the performance of its services herein contracted for, shall not have, nor shall it exercise any line authority within the administration of [Crystal Springs Center and Chope Hospital] or County, and that all of its services herein contracted for shall be that of an independent contractor, advisor, consultant, and liaison between the Director and, where appropriate, the Director of General Services on the one hand and the personnel of [Crystal Springs Center and Chope Hospital] on the other hand . . .

"Contractor shall provide to County an on-site, full-time, competent, experienced, and qualified general project manager . . . [and] hospital controller. Contractor shall not make assignments of its personnel to said positions nor shall such of its personnel be reassigned or removed from said positions . . . without the consent of the Director having first been obtained . . .

"All medical and professional matters pertaining to the practice of medicine set forth in the by-laws of the Center medical staff as approved by the Board of Supervisors shall be the responsibility of County and the medical staff of Center, subject only to Contractor's consultation and advice concerning same.

"In order to assure adequate liaison between the medical staff of Center, the County, and Contractor, Contractor and County jointly shall establish a Joint Conference Committee for Center consisting of representatives of the medical staff, the hospital administrator, and other representatives of the County deemed necessary and desirable. Such Joint Conference Committee shall meet as frequently as necessary or desirable but in any event shall meet monthly unless otherwise scheduled by the Joint Conference Committee . . . having duties as follows:

"a. To use its best efforts to assure to Center that the highest medical, ethical, and professional standards are maintained therein.

"b. To use its best efforts to assure that all patients admitted to Center or who are treated as out-patients receive the best possible patient care.

"c. To provide a forum for discussion and solution of problems of a mixed medical-administrative nature that may arise between the medical staff and the administrative staff of Center.

"d. To use its best efforts to assure that plans for future operations of Center reflect both the medical and administrative needs of the County.

"e. To fully cooperate with County in the training of designated County personnel in Contractor's area of expertise in the full scope of hospital management.

"Contractor shall also provide to Center, for consultation and advice, its staff specialists in such fields as accounting, accreditation, administration, auditing, budgeting, community relations, dietary services, emergency care, environmental control, food management, laboratory, management assistance and data processing, materials management, medical records, nursing, pharmacy operations, physicians recruitment, purchasing, quality assurance, respiratory therapy, radiology, insurance management, and third-party reimbursement, hereinafter referred to as support personnel.

"Contractor shall establish a management development program for Center's department heads and supervisors and shall conduct seminars for director of nursing, in-service directors and administrators, and controllers, and seminars in other departmental oriented activities. Key personnel of Center shall participate as needed in Contractor-conducted education and evaluation programs designed to improve the efficiency, labor productivity, cost effectiveness, and quality of care at Center and to insured continuity of management information and capacity should Contractor not continue to provide services after the expiration of this present agreement. . . .

"Prior to assisting in or causing any significant change in the scope of services offered by Center or any change in medical equipment or facilities which may cost in excess of $50,000, Contractor shall seek the advice of the medical staff through the Joint Conference Committee and of the Hospital Consortium, so long as the County is a member of said Consortium, before submitting such recommendations to the Board of Supervisors for their approval. Further, Contractor shall maintain active and cooperative participation in the Hospital Consortium during County's membership therein . . . .

"Contractor shall install an enterprise fund accounting system on an accrual basis in conjunction with the patient billing system and accounts payable, payroll, patient charges and postings to the general ledger. Plans for this installation shall be presented to County for review and consideration and shall include provisions for installing such systems on the County's computer system as well as other alternatives which may appear feasible to the Contractor.

"Contractor shall evaluate existing personnel and personnel assignments in in-patient, out-patient clinical and ancillary service areas and it shall recommend to the Director the training needs of such personnel.

"Contractor shall conduct training sessions and workshops for Center personnel on a regular on-going basis, the purpose of which shall be to enhance upgrading of accounting personnel and standardization of their procedures . . .

"Contractor shall cause to be prepared all [financial] management reports . . .

"Contractor shall assist in and shall supervise the preparation of an annual budget conforming to all applicable governmental regulations at all levels, which budget shall set major operating objectives, revenues, and expenses and capital expenditures and Contractor shall, within the life of this agreement, cause the budget to be presented to County prior to the commencement of each fiscal year for County's acceptance, rejection or modification . . . .

"Contractor shall recommend to County, for its consideration, patient rate structures which take into account the financial obligations of County and Center together with the level of rates at other comparable medical facilities in and about the area with a view to providing the highest quality health care at the lowest possible cost . . . .

"Contractor shall conduct a capital equipment survey . . . .

"Contractor shall advise the Director of General Services with regard to the potential for utilizing group purchasing efforts . . . .

"Contractor shall use its best efforts to establish quality control in all of the operations . . . .

"Contractor shall, at the request of the Director of General Services, assist in the negotiation of service contracts . . . .

"Contractor shall develop an industrial relations program which may include: departmental meetings, department head meetings, development of departmental participation standards, suggestion programs, initiation of employee annual events, service awards, career counseling and internal promotion, open review and evaluation policies with employee participation, subject to County policy.

"Contractor shall, upon request, assist the appropriate personnel of County to pursue, on an appropriate priority basis, projects of the following types:

"a. Work standards, staffing patterns, personnel utilization and labor costs.

"b. Data processing procedures and management information reports for control of daily operations.

"c. Design of work areas, systems and methods along cost effectiveness lines.

"d. Development of job descriptions, evaluation plans and merit rating procedures.

"e. Institution of production, inventory and quality control systems including attendant forms.

"f. Development and implementation of payroll budget systems.

"g. Generation of technical information, future forecasting for need, demand and supply of data in useful form to managerial decision makers.

"h. Development and implementation of selected management training programs on a continuing basis for all management personnel of Center.

"Contractor shall establish and maintain effective and appropriate liaison with the medical community within the County of San Mateo and relevant adjacent areas, which liaison shall include:

"a. Consultation with hospital's medical staff in the selection of equipment, medical programs and medical counsel.

"b. Assistance in recruiting such additional practicing physicians as deemed necessary for adequate medical services.

"c. Making available to County of any and all of its resources to assist County in any hospital-based community efforts to improve the health and welfare of its residents, including establishment of close working relationships with other community health related organizations.

"Contractor shall provide to each department of Center any and all appropriate assistance necessary or desirable to establish and maintain appropriate levels of fund operation and medical services, which assistance shall include consultation with its appropriate support personnel development of manuals and instructional materials; and development of appropriate procedures as requested . . . .

"Subsequent to the acceptance of this agreement, and not later than ninety days from the date of that acceptance, Contractor shall provide to the Director a work plan and calendar specifying the procedural and organizational changes recommended to be accomplished during the remainder of the term of this agreement, and not later than one hundred eighty days from the date of that acceptance a work plan and calendar specifying the procedural and organizational changes recommended to be accomplished during any extension of this agreement . . . Failure of

Contractor to maintain such performance standards and objectives shall constitute a breach of this agreement or any extension hereof, and shall cause Contractor to be liable for such damages as may result to County therefrom.''

B. *Trial*

On July 29, 1977, two days before N.M.E. was to begin performance under the subject contracts, appellant filed his complaint for writ of mandate and declaratory and injunctive relief. After the court sustained respondents' demurrer to the complaint for declaratory and injunctive relief, appellant amended the original petition and complaint, alleging that he was bringing the action pursuant to Code of Civil Procedure section 526a as a resident taxpayer. In addition, appellant alleged that respondents had planned substantial reductions in the level of health care and deletions of some services at one or both of the facilities in question and that N.M.E.'s management ''has been characterized by increased restrictions on patient eligibility, reduction in full time hospital staff and cutbacks in the level of services provided to the indigent.''

At trial, Dr. Howard Gurevitz, Acting Director of the San Mateo Department of Health and Welfare during N.M.E.'s performance of the subject contracts, testified that he supervised N.M.E.'s performance. He stated that he met regularly two to three times a week with the N.M.E. consultants, Messrs. Winters and Gibson. During those meetings, they ''developed understandings as to what kinds of things they . . . should be undertaking, . . . how they should be relating to the County Manager, what kinds of work plans needed to be developed and reviewed.'' He stated that N.M.E. developed and submitted work plans on a regularly scheduled basis as required by the contracts and that such work plans were reviewed within ''the departments and subsequently reviewed within the County Manager's Office.'' He stated that he on occasion made suggestions for changing the work plans and that he specifically gave his consent to having Messrs. Winters and Gibson perform certain informational tasks such as writing memos to the staff. He added: ''They had responsibilities to keep the operations going as far as routine matters were concerned, in terms of purchasing, in terms of organizing the work on a day to day basis, making sure the door was open and things were done. They had that responsibility, and it was with the understanding that, should there be any kinds of procedures that they felt or I would feel required some kind of review, they would consult with me in advance. [¶] The only—the area where—that I asked them to come directly through me, without going as a routine matter, was in any personnel transaction; for instance, performance reports, recruitment of personnel.''

Dr. Gurevitz stated that N.M.E. "ran the team in terms of the routine matters as far as operations were concerned" and that he and the Board "set policy matters." He explained: "[I]f there was a departure from the routine, you know, if they were going to suggest a new method for purchasing, ordering, even though purchasing is maybe a mundane matter, any departure procedurally would have been reviewed with me prior to its implementation; otherwise just the reinitiation or reordering or doing things on a kind of routine basis would go as it had with their direct management responsibility." He stated that the subdepartment heads at Chope Hospital were under the direction and control of Mr. Gibson on routine matters but that he decided changes in procedures or policies.

Dr. Gurevitz opined that Messrs. Winters and Gibson brought to the County experience and expertise that was not other otherwise available in the County.

C. *Findings of fact and conclusions of law*

In its findings of fact, the trial court found in relevant part that: 1) by the terms of the subject contracts, N.M.E.'s personnel was to exercise "some day to day management functions" at the subject facilities; 2) "[t]he County Manager and the then Acting Director of the Health and Welfare Department of the County of San Mateo continued to set policy for the management of both medical facilities . . . and were directly involved in the direction of operation at each of the facilities"; 3) "[t]he County of San Mateo, through its officers and employees, at all times relevant hereto, were the ultimate managers of both Chope Hospital and Crystal Springs Rehabilitation Center"; and 4) N.M.E. "performed services not otherwise available to the County generally, in that they provided persons with expertise not possessed by County employees, and who would be called upon instantly for specific projects."

In its conclusions of law, the court ruled in relevant part that: 1) respondents did not transfer the management of the facilities in question within the meaning of Health and Safety Code sections 1442 and 1442.5 et seq.; 2) the subject contracts were for "special services" within the meaning of the Charter of San Mateo and Government Code sections 31000 and 53060; and, 3) respondents were not required to hold public hearings pursuant to Health and Safety Code sections 1442 and 1442.5, and otherwise properly executed and implemented the subject contracts.

DISCUSSION

Initially, we note that, although the subject contracts have been fully performed, we have not dismissed the appeal as moot because the case

presents issues of statutory interpretation which are of general public interest and are likely to recur. (See *Green* v. *Layton* (1975) 14 Cal.3d 922, 925 [123 Cal.Rptr. 97, 538 P.2d 225]; *Knoll* v. *Davidson* (1974) 12 Cal.3d 335, 344 [116 Cal.Rptr. 97, 525 P.2d 1273].)

I. *Health and Safety Code sections 1442 and 1442.5*

■ Appellant's first contention is that the County of San Mateo's contracts with N.M.E. for management services at the subject facilities constituted a "transfer of management" within the meaning of Health and Safety Code sections 1442 and 1442.5.

Beginning in the 1930's, California counties built an extensive system of county hospitals, health care facilities and health care programs to meet the health care needs of the poor. (See Ten Brock, *California Welfare Law—Origins and Development* (1957) 45 Cal. L.Rev. 241.) However, beginning in the early 1970's, the counties began to reverse this trend, and many reduced services, discontinued programs, closed facilities, or transferred management of facilities to private management firms. (See, Assem. Com. on Health, Interim Hearing on the Future of County Hospitals (1976) pp. 267-271.)

Against this background of reduction of the quality and quantity of health care available to the poor, the Legislature in 1974 added sections 1442 and 1442.5 to the Health and Safety Code. Section 1442 provides in relevant part as follows: "The board of supervisors in each county, prior to closing a county hospital or other county medical facility, eliminating any area of service in a county hospital or other county medical facility or reducing the level of services provided to indigents as of January 1, 1975, or prior to leasing, selling, or *in any way transferring the management* of a county hospital or other county medical facility, shall file with the State Department of Health Services and the appropriate areawide voluntary health planning agency the following: (a) A description of the county's existing facilities and services, the board's proposal for changing those facilities or services, including a plan for providing the eliminated services or facilities through alternative means. (b) A copy of any contracts, agreements, or arrangements with any facility or individual to provide services to indigent people." (Italics added.) Section 1442.5 provides in relevant part as follows: "Prior to closing a county facility, eliminating or reducing the level of services provided, or prior to the leasing, selling, or *transfer of management,* the board shall provide public notice, including notice posted at the entrance to all county health care facilities, of public hearings to be held by the board prior to their decision to proceed. Such notice shall be posted not less than 90 days prior to such public hearings.

[¶] The board shall make findings based on evidence and testimony from these hearings that their proposed action will not have a detrimental impact on the health care needs of the indigents of the county. Such findings shall be included as part of the official public hearing record." (Italics added.)

The evident purpose of these sections is "to insure that the duty of the counties to provide health care to indigents is properly and continuously fulfilled." (Stats. 1974, ch. 810, p. 1764.) Thus, section 1442.5 further provides: "Notwithstanding the board's closing of a county facility, the elimination of or reduction in the level of services provided, or the leasing, selling, or transfer of management of a county facility subsequent to January 1, 1975, the county shall provide for the fulfillment of its duty to provide care to all indigent people, either directly through county facilities or indirectly through alternative means, (a) Where this duty is fulfilled by a contractual arrangement with a private facility or individual, the facility or individual shall assume the county's full obligation to provide care to those who cannot afford it, and make their services available to Medi-Cal and Medicare recipients."

It is clear that the procedural requirements of section 1442.5 must be followed if the agreement in question provided for a transfer of management. The construction of the term, "transfer of management," within the meaning of these sections is an issue of first impression.

According to several leading authorities in the management field, the essential functions of management include planning, organizing, staffing, direction, control, and innovation. (Dale, Management: Theory and Practice (1973) pp. 4-7; Koontz and O'Donnell, Principles of Management: An Analysis of Managerial Functions (1972) pp. 46-52; see also Drucker, Management: Tasks, Responsibilities, Practices (1974) pp. 40-48, 400-401; McFarland, Management, Foundations and Practices (1979) pp. 122-123, 186-190, 238-240.) Planning involves selecting objectives and the means for achieving them and is essentially a decision-making function. Staffing includes the power to hire, train evaluate and discharge employees. Control is the measuring and correction of activities of subordinates to ensure that they conform to plans. Innovation involves conceiving of and bringing about changes which would financially improve the enterprise managed. (Dale, *op. cit. supra,* at pp. 4-7; Koontz and O'Donnell, *op. cit. supra,* at pp. 46-52.) In sum, management involves responsibility for and control over an enterprise.

The trial court seemed to have had our construction of the term "transfer of management" in mind when, in its findings of fact, it ruled that "[t]he County Manager and the then Acting Director of the Health

and Welfare Department of the County of San Mateo continued to set policy for the management of both medical facilities . . . and were directly involved in the direction at each of the facilities" and that "[t]he County of San Mateo, through its officers and employees . . . were the ultimate managers" of the subject facilities.

The terms of the contracts and testimony of Dr. Howard Gurevitz support this finding. Before outlining the services to be furnished by N.M.E., the subject contracts provided that the "ultimate direction and authority" rested with the board of supervisors and the Director of Public Health and Welfare, and, where applicable, the Director of General Services. The contracts also provided that, during their one year operation, N.M.E. would "not have nor . . . exercise any line of authority within the administration" of the two health facilities. N.M.E. was designated as "an independent contractor, advisor, [and] consultant. . ." Although N.M.E. contracted to provide a general project manager and a hospital controller, the contract specified that N.M.E. would not make assignments of its personnel to these positions nor remove individuals from the positions without the consent of the Director of General Services. Indeed, it is significant that the subject contracts provided that N.M.E.'s involvement in recruitment and hiring, the provision of services and their cost, and sundry administrative matters was in an advisory capacity only.

The testimony of Dr. Gurevitz shows that the county in fact maintained responsibility for and control over the operation of the subject facilities. Dr. Gurevitz stated that, as Acting Director of the San Mateo Department of Health and Welfare, he met with the N.M.E. consultants on a regular basis several times a week. He also testified that work plans submitted by N.M.E. were reviewed within the hospital departments as well as the county manager's office. In addition, he reviewed all matters having to do with personnel, including recruitment and evaluation of staff. And lastly, although N.M.E. was in charge of operations insofar as it involved routine matters, he reviewed any changes in procedures prior to their implementation.

We have here contracts which clearly speak in terms which retain to the county, and particularly the Director of Health and Welfare, the management of the operations in question. By their very terms, N.M.E. is to provide advice, consultation, programs for the future, and assistance upon request. Contracting for these services by a county is not a transfer of management within the meaning of sections 1442 and 1442.5. To hold otherwise would require compliance with the hearing process set forth in these sections with every attempt by a county to seek outside advice and

assistance, unavailable from county staff, in the performance of its management function.

II. *Government Code sections 31000 and 53060*

■ Appellant next maintains that, under Government Code sections 31000 and 53060, the San Mateo Board of Supervisors was required specifically to make a finding that N.M.E.'s services were special within the meaning of those statutes and that, in any event, the evidence adduced at trial was insufficient to support the trial court's finding that the services of N.M.E. were special.

Section 31000 provides in pertinent part as follows: "The board of supervisors may contract for special services on behalf of the following public entities; the county, any county officer or department, or any district or court in the county. Such contracts shall be with persons specially trained, experienced, expert and competent to perform the special services. The special services shall consist of services, advice, education or training for such public entities or the employees thereof. The special services shall be in financial, economic, accounting (including the preparation and issuance of payroll checks or warrants), engineering, legal, medical, therapeutic, administrative, architectural, airport building security matters."

Section 53060 in pertinent part provides: "The legislative body of any public or municipal corporation or district may contract with and employ any persons for the furnishing to the corporation or district special services and advice in financial, economic, accounting, engineering, legal, or administrative matters if such persons are specially trained and experienced and competent to perform the special services required. [¶] The authority herein given to contract shall include the right of the legislative body of the corporation or district to contract for the issuance and preparation of payroll checks."

These sections have been incorporated in San Mateo County's Charter. (See *Handler* v. *Board of Supervisors* (1952) 39 Cal.2d 282, 285-286 [246 P.2d 671].)

■ Whether services are special requires a consideration of factors such as the nature of the services, the qualifications of the person furnishing them and their availability from public sources. (*Jaynes* v. *Stockton* (1961) 193 Cal.App.2d 47, 51-52 [14 Cal.Rptr. 49].) Services may be special because of the outstanding skill or expertise of the person furnishing them. (*Kennedy* v. *Ross* (1946) 28 Cal.2d 569, 574 [170 P.2d

904]; *Jaynes* v. *Stockton, supra,* 193 Cal.App.2d at p. 52.) Whether services. are special is a question of fact. (*California Sch. Employees Assn.* v. *Sunnyvale Elementary Sch. Dist.* (1973) 36 Cal.App.3d 46, 61 [111 Cal.Rptr. 433]; *Jaynes* v. *Stockton, supra,* 193 Cal.App.2d at p. 53.)

 Initially, we note that the subject statutes do not require that a board of supervisors specifically make a finding that services are special as a prerequisite to the validity of the contract for such services. Appellant cites no authority, and we are aware of none, in support of such a proposition. Indeed, where the Legislature intended a board of supervisors to make specific findings on a particular issue, it explicitly stated that intent. (See, e.g., Health & Saf. Code, § 1442.5.) We therefore conclude that the failure of sections 31000 and 53060 specifically to require a finding on this issue indicates that no such finding is required.

In any event, the record shows that a sufficient finding was in fact made. Both of the subject contracts provided: "WHEREAS, pursuant to Article XIV, Section 4, Paragraphs 3 and 12, respectively, of the Charter of the County of San Mateo and Government Code sections 31000 and 53060, County may employ professional experts on a temporary basis for a specific project and may contract with an independent contractor for the furnishing of such services; and [¶] WHEREAS, County is the owner and operator of [Chope Hospital and Crystal Springs Rehabilitation Center], . . . and [¶] Whereas, contractor is a corporation engaged in providing management expertise and services for hospitals by means of personnel trained and skilled in all aspects of hospital organization, administration, and management and is knowledgeable as to all laws and regulations together with the standards of the Joint Committee on Accreditation of Hospitals pertaining thereto." These provisions clearly indicate that the Board had concluded that the services for which they contracted were indeed special within the meaning of the subject statutes.

The trial court found in its findings of fact that N.M.E. "performed services not otherwise available to the County generally, in that they provided persons with expertise not possessed by County employees, and who could be called upon instantly for specific projects." In its conclusions of law, the court found that the subject contracts were for special services within the meaning of the San Mateo Charter and Government Code sections 31000 and 53060. We conclude that its findings are supported by substantial evidence.

Every witness testified that, although some of the suggestions of N.M.E. were made by previous County employees, the County was concerned that certain suggested changes be made swiftly. County Manager David

Nichols testified that, without the swiftness with which N.M.E. could provide these services, Chope Hospital would likely have been closed. Supervisor Ward testified that there were no public sources within the county or elsewhere which could have been called upon by the board of supervisors to perform the functions and give the consultation, advice, and service provided by N.M.E. He testified that N.M.E.'s broad experience in providing management services at county and other general hospitals was the type of specialized service found lacking in the county previously. He agreed with County Manager Nichols that only such an entity as N.M.E. could have brought the subject facilities to fiscally adequate operational levels within the time that was allotted in the county's plan for those facilities. This evidence was more than sufficient to support the lower court's findings.

## III. *Adequacy of findings*

Appellant lastly submits that the trial court's failure to render adequate findings on the issue whether respondent board of supervisors specifically determined that the services of N.M.E. were special within the meaning of Government Code sections 31000 an 53060 constitutes reversible error.

It is true that it is error for the trial court to fail to make findings on all material issues. (4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 337, pp. 3139-3140; *San Jose etc. Title Ins. Co.* v. *Elliott* (1952) 108 Cal.App.2d 793, 801 [240 P.2d 41].) Here, however, we have found as a matter of law that respondent board was not required to make any specific finding on the issue of special services and that, in any event, an adequate finding was in fact made. Under these circumstances, appellant's final argument must be rejected.

The judgment is affirmed.

Grodin, P. J., and Rouse, J., concurred.

A petition for a rehearing was denied November 19, 1982, and appellant's petition for a hearing by the Supreme Court was denied January 5, 1983. Grodin, J., did not participate therein.