[No. B042669. Second Dist., Div. Seven. Oct. 19, 1989.]

TOPANGA ASSOCIATION FOR A SCENIC COMMUNITY et al., Plaintiffs and Appellants, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents;
OAKMONT DEVELOPMENT ASSOCIATES et al., Real Parties in Interest and Respondents.

1350

1352

**COUNSEL**

Rosemary Woodlock for Plaintiffs and Appellants.

No appearnace for Defendants and Respondents.

Gold, Marks, Ring & Pepper and Joshua L. Rosen for Defendants and Respondents and for Real Parties in Interest and Respondents.

OPINION

LILLIE, P. J.—Plaintiffs Topanga Association for a Scenic Community and Woodland Hills Homeowners Organization appeal from judgment denying their petition for a writ of mandate which would have ordered the County of Los Angeles, its board of supervisors and certain of its agencies to set aside their approval of a project for development of a tract of land in an unincorporated area of the county.

FACTUAL AND PROCEDURAL BACKGROUND

The project in question is located on the southern flank of the Santa Monica Mountains just below their crest. The property immediately to the north, south and east of the project is vacant; the property to the west consists of single-family residences. The project contemplates subdivision of a tract of 78.7 acres into 83 single-family residential lots and 6 open-space lots with construction of roads, utilities and appurtenances necessary for the development of the residential lots.

Oakmont Development Associates (developer) submitted to the county department of regional planning (department) applications for approval of a tentative tract map, a hillside management conditional use permit and an oak tree permit for the project. On the basis of an initial study which it prepared, the department recommended approval of the applications and found that the project qualified for a negative declaration. Following a hearing the county regional planning commission (commission) determined that the project would not have a significant effect on the environment and approved the tentative tract map, the conditional use permit and the oak tree permit authorizing removal of 57 out of 177 oak trees on the project site in order to make way for construction of interior streets, driveways and building pads. The commission also approved the negative declaration prepared for the project.

Plaintiffs appealed the commission's decision to the county board of supervisors (board). The board held a de novo hearing on the appeal. At the conclusion of the hearing the board announced its intention to approve the

project and directed the county counsel to prepare appropriate findings and conditions. On September 27, 1988, the board adopted such findings and conditions and approved the tentative tract map, the conditional use permit, the oak tree permit and the negative declaration.

On November 1, 1988, plaintiffs petitioned the superior court for a writ of mandate (Code Civ. Proc., § 1094.5) ordering the commission and the board to set aside their respective recommendations and approvals. The amended petition alleged violation of the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) by issuance of a negative declaration rather than preparation of an environmental impact report (EIR). Violation of the Subdivision Map Act (Gov. Code, § 66410 et seq.), the Los Angeles County General Plan and county zoning and planning ordinances also was alleged. Following the sustaining of a demurrer to the causes of action alleging violation of the CEQA, plaintiffs filed a second amended petition for writ of mandate which omitted reference to the CEQA and added an allegation of the unconstitutionality of a provision of the Subdivision Map Act.

Judgment was entered denying the petition. This appeal followed.[1] Other pertinent facts are developed in the discussion.

DISCUSSION

I

*Environmental Considerations Support Approval of the Project*

■ Appellants argue that elimination of their CEQA causes of action does not foreclose an environmental challenge to the approval of the project because the Subdivision Map Act, in Government Code section 66474, subdivision (e),[2] provides for environmental impact review separate from and independent of the requirements of the CEQA. We agree. "[T]he finding required by section 66474, subdivision (e) is in addition to the requirements for the preparation of an environmental impact report" or a

---

[1] Pursuant to appellants' petition for writ of supersedeas we issued an order prohibiting the developer from conducting physical activity on the project site pending disposition of the appeal.

[2] Government Code section 66474 provides in pertinent part: "A legislative body of a city or county shall deny approval of a tentative map, or a parcel map for which a tentative map was not required, if it makes any of the following findings: . . . [¶] (e) That the design of the subdivision or the proposed improvements are likely to cause substantial environmental damage or substantially and unavoidably injure fish or wildlife or their habitat."

negative declaration pursuant to the CEQA. (59 Ops.Cal.Atty.Gen. 129, 130 (1976).) As respondents point out, section 66474, subdivision (e) requires disapproval of a project upon a finding that it is likely to cause substantial environmental damage; it does not require a finding of no substantial environmental damage as a condition of approval of a project. The board nevertheless made the following finding: "The design of the subdivision and the proposed improvements will not cause substantial environmental damage or substantial and avoidable injury to fish or wildlife or their habitat, since the project is not located in a Significant Ecological Area and the initial study for the project shows that the proposed development will not have a significant effect on the environment."

■■■■■■■■ Appellants argue that the finding of no substantial environmental damage[3] constitutes an abuse of the board's discretion because the finding is not legally sufficient and is unsupported by substantial evidence.[4] (See Code Civ. Proc., § 1094.5, subd. (b).)

■ The findings of an administrative agency must be sufficient to enable the parties to determine whether and upon what basis they should seek review and to allow a reviewing court to determine the basis for the agency's action. (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 514 [113 Cal.Rptr. 836, 522 P.2d 12].) However, great specificity is not required. It is enough if the findings form an analytic bridge between the evidence and the agency's decision. (*Id.,* at p. 515.) In addition, findings are to be liberally construed to support rather than defeat the decision under review. (*Fair Employment Practice Com.* v. *State Personnel Bd.* (1981) 117 Cal.App.3d 322, 329 [172 Cal.Rptr. 739].) "[W]here reference to the administrative record informs the parties and reviewing courts of the theory upon which an agency has arrived at its ultimate finding and decision it has long been recognized that the decision should be upheld if the agency 'in truth found those facts which as a matter of law are essential to sustain its . . . [decision].' [Citations.]" (*McMillan* v. *American*

---

[3] The term "substantial environmental damage" as used in subdivision (e) of section 66474 of the Government Code is the equivalent of " 'significant effect on the environment' " which is defined in section 21068 of the Public Resources Code as " 'a substantial, or potentially substantial, adverse change in the environment.' " (68 Ops.Cal.Atty.Gen. 108, 111, fn. 2 (1985).)

[4] Code of Civil Procedure section 1094.5, subdivision (c) provides two tests for review of the evidence in abuse of discretion cases: the independent judgment rule and the substantial evidence rule. Unless a fundamental vested right is involved, the substantial evidence test is to be applied both by the trial court and the appellate court. (*City of Walnut Creek* v. *County of Contra Costa* (1980) 101 Cal.App.3d 1012, 1016 [162 Cal.Rptr. 224].) Cases involving abuse of discretion charges in the area of land use regulation do not involve fundamental vested rights. (*Ibid.*) Accordingly, the substantial evidence test is the appropriate standard in this case.

*Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 184 [131 Cal.Rptr. 462].) ■ The finding which plaintiffs attack meets these criteria inasmuch as it clearly informs plaintiffs and this court that one of the grounds upon which the board approved the project was that it would cause no substantial environmental damage.

■ In determining the sufficiency of the evidence to support the findings an appellate court must " '. . . determine whether the evidence, viewed in the light most favorable to the respondent, sustains the findings subject to review, resolving any reasonable doubts in favor of those findings. [Citation.] In making this determination the appellate court must resolve all conflicts in the evidence in favor of the judgment or decision of the tribunal below and indulge in all legitimate and reasonable inferences to support it.' " (*Greenebaum* v. *City of Los Angeles* (1984) 153 Cal.App.3d 391, 408 [200 Cal.Rptr. 237].)

■ Appellants contend the board's finding of no substantial environmental damage is not supported by the initial study made by the department and mentioned in the finding.[5] The contention lacks merit. The initial study separately analyzed 15 environmental factors and on that basis determined that the project would have no significant impact on the environment. Appellants insist that the 1987 initial study contains "inaccuracies and misstatements," as shown by testimony of interested citizens at the public hearings on approval of the project, and other evidence. This contention amounts to an invitation to reweigh conflicting evidence before the board. We may not do so. (See *McMillan* v. *American Gen. Fin. Corp., supra,* 60 Cal.App.3d 175, 186; *Estate of Gerber* (1977) 73 Cal.App.3d 96, 112-113 [140 Cal.Rptr. 577].)

■ Appellants next argue that the initial study is inadequate as a finding under section 66474, subdivision (e) of the Government Code because it was prepared before discovery of archaeological sites on the project and hence does not consider that factor. The record shows: The initial study, prepared in 1987, indicated that the project site was not in or near an area containing known archaeological resources. In August 1988 Dr. Chester King, a self-employed anthropological consultant, surveyed the project area and discovered two archaeological sites which he registered with the UCLA Institute of Archaeology. At the de novo hearing before the board on September 1, 1988, Dr. King testified to the discovery and expressed his opinion that

---

[5] Appellants note that the finding does not state upon which of two initial studies (one made in 1987 and the other in 1988) it is based. Inasmuch as parallel diagonal lines, together with the letters "N/A," appear on the title page of the 1988 initial study, we assume that the board's finding refers to the 1987 initial study.

both archaeological sites would be "seriously impacted" by the project. On September 13, 1988, Dr. Mark Raab and other staff archaeologists at the Northridge Center for Public Archaeology inspected the archaeological sites in the project area discovered by Dr. King. Based on such inspection the archaeologists recommended measures to be taken at the project site in order to eliminate or lessen damage to archaeological resources. The results of the inspection and the recommendations were set forth in a written evaluation dated September 22, 1988.

Respondents correctly state that the mere presence of archaeological resources on property does not require a finding that the development of the property would cause a "significant effect on the environment" (CEQA) or "substantial environmental damage" (Subdivision Map Act). An EIR must address the presence of archaeological resources, and a negative declaration is precluded by the presence of such resources, only if the archaeological resources are *unique*. (Pub. Resources Code, § 21083.2, subd. (a).) A "unique archaeological resource" is defined as "an archaeological artifact, object, or site about which it can be clearly demonstrated that, without merely adding to the current body of knowledge, there is a high probability that it meets any of the following criteria: [¶] (1) Contains information needed to answer important scientific research questions and that there is a demonstrable public interest in that information. [¶] (2) Has a special and particular quality such as oldest of its type or best available example of its type. [¶] (3) Is directly associated with a scientifically recognized important prehistoric or historic event or person." (*Id.,* subd. (g).) An archaeological artifact, object or site which does not meet these criteria is a nonunique archaeological resource and "need be given no further consideration, other than the simple recording of its existence by the lead agency if it so elects." (*Id.,* § 21083.2, subd. (h).)

The board made no finding that the archaeological sites in the project contain unique archaeological resources. Accordingly, the presence of archaeological resources in the project area did not preclude a finding that the project would not cause substantial environmental damage. Further, absent a finding that the archaeological resources in question are unique the board was not required to impose conditions on the developer designed to mitigate significant effects of the project on unique archaeological resources. (See Pub. Resources Code § 21083.2, subd. (c).) Nevertheless, the board, following some of the recommendations of the archaeologists, imposed the following conditions on its approval of the tentative tract map and the conditional use permit: The developer is required to have a qualified archaeologist at the project during grading and infrastructure construction; to assist on-site monitoring the archaeologist is to conduct a field survey prior to grading

and the field survey report is to be reviewed by a responsible archaeological center prior to grading; the developer is further required to suspend construction in the vicinity of any cultural resource encountered during development of the project site and to leave the resource in place until a qualified archaeologist can examine it and determine appropriate mitigation measures; finally, the developer is required to comply with mitigation measures recommended by the archaeologist and approved by the department.

Appellants point out that in a report dated June 19, 1989, prepared for the developer, Dr. Raab stated that while he recommended capping one of the archaeological sites (CA-LAn-1424) with fill material as an ideal method of preserving archaeological resources, the engineers in charge of the proposed grading plan for the project indicated that capping the site is not feasible within the scope of the proposed construction. Dr. Raab added: "Soil compaction requirements will cause destruction to all of the archaeological loci within the project. This being the case, the crucial question then arises as to whether sites CA-LAn-1423 and CA-LAn-1424 are significant under criteria (Appendix K) of the California Environmental Quality Act of 1970." Later in his report Dr. Raab answered that question in the negative and added: "If the proponents of the proposed construction on the subject parcel choose to move ahead with their construction plans, the data produced by this study indicate that adverse impact would not occur to [the two sites in question] despite the fact that these loci are likely to be destroyed during construction."

Appellants contend Dr. Raab's report demonstrates that they are entitled to an unbiased report prepared by an independent archaeologist acceptable to them, the county and the developer. In support of this contention appellants cite the following passage from *Society for California Archaeology* v. *County of Butte* (1977) 65 Cal.App.3d 832 [135 Cal.Rptr. 679]: " ' "[W]here comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. *There must be good faith, reasoned analysis in response.*" ' (Italics in original.) [Quoting *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 842 [115 Cal.Rptr. 67].] [¶] Reviewing the record before us, we note that the board did not respond adequately to the adverse environmental indications presented to it. In fact, it did not really respond to them at all." (65 Cal.App.3d at p. 840, fns. omitted.) In the present case Dr. Raab's report of June 19, 1989, did not contain "adverse environmental indications," but on the contrary indicated that no adverse impact would occur from destruction of the archaeological sites as a result of proposed construction activities in the project area.

Appellants complain that the board did not publicly evaluate the various reports and comments generated by the archaeology sites following the September 1988 hearing despite the fact that it is now revealed the sites may be destroyed by the project. Such public evaluation is not required. "To allow the public review period to proceed *ad nauseam* would only serve to arm persons dead set against a project with a paralyzing weapon—hired experts who can always 'discover' flaws in mitigation measures." (*Long Beach Sav. & Loan Assn.* v. *Long Beach Redevelopment Agency* (1986) 188 Cal.App.3d 249, 263 [232 Cal.Rptr. 772].)

■ Appellants further contend the board's finding that the project will not cause substantial and avoidable injury to wildlife habitat is unsupported in view of the fact that 57 out of 177 oak trees in the project area will be destroyed. This contention ignores the board's approval of the oak tree permit the purpose of which is to allow the destruction of oak trees under prescribed circumstances. (See Los Angeles County Code, § 22.56.2060 et seq.) In approving the permit the board made findings which showed that the developer met the specified burden of proof for issuance of the permit.[6] (*Id.,* § 22.56.2100.) The board also imposed conditions which require replacement of the trees to be removed with new trees on a two-to-one ratio and protection of the remaining trees during and after development of the project. (See *id.,* § 22.56.2180.)

II

*The Number of Units in the Project Does Not Exceed the Maximum Permitted Density*

Under the countywide general plan governing land use, the project requires approval of a conditional use permit to regulate development of the project area consisting of slopes 25 percent or greater. The board approved a conditional use permit authorizing a maximum density of 83 dwelling units for the project. Pursuant to formulas set forth in the Malibu/Santa Monica Mountains Area Plan (MSMMAP), the areawide plan applicable to the project site, the maximum allowable density in the urban hillside area of the project is 73.39 units and the maximum allowable density in the nonurban hillside area is 18.85 units, for a total of 92.24 units. While the total

---

[6] The board found: The proposed construction will be accomplished without endangering the health of the trees remaining in the project area; removal of the 57 trees will not result in soil erosion through the diversion or increased flow of surface waters which cannot be satisfactorily mitigated; removal of the trees is necessary because they will interfere with the alignment of proposed interior streets and the location of driveways and pad sites, and no alternative to such interference exists other than removal of the trees.

number of units approved for the project is less than the overall maximum density allowable, the number of units to be built in the nonurban hillside portion of the project exceeds the allowable maximum density of 18.85 units for that portion.

 Appellants contend it is impermissible to shift allowable densities from urban to nonurban hillside areas. This contention appears to be supported by the following language in *Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 311 [223 Cal.Rptr. 18]: "[T]he MSMMAP policy . . . prohibits transference of urban residential densities allocated to a project from an urban to a rural mapped area." This statement ignores the following provision of the general plan: "Units may be transferred internally in a project (regardless of urban or non-urban designation) when geological or topographical data support the need. The change is for the purpose of better design and permitted only when it does not increase the number of units or affect health and safety detrimentally." To the extent the policy of the MSMMAP as enunciated in *Las Virgenes* is inconsistent with the general plan the latter governs for, as explained in *Las Virgenes,* "[t]he areawide plan serves to complete, extend and refine the General Plan land use policy, not contradict it." (177 Cal.App.3d at p. 312.) Regarding the conditions for internal transfer of units specified in the general plan, the board found: "The proposed project is located and designed so as to protect the safety of current and future community residents, and will not create significant threats to life and/or property due to the presence of geologic, seismic, slope instability, fire, flood, or erosion hazard."

The board also found: "The approval of proposed dwelling units exceeding the number permitted by the total of the midpoint threshold and the low density threshold for the proposed development in urban and non-urban hillsides is based on the ability to mitigate problems of public safety, design and/or environmental considerations as provided in the General Plan. The proposal does not exceed the maximum allowable densities for the location." Appellants attack this finding on the ground there was no evidence of ability to mitigate environmental and design problems when the finding was made because at that time the revised landscape plan had not been submitted and no determination had been made regarding protection of the archaeological sites.[7] Among conditions attached to the approval of the project were measures to be taken by the developer to protect archaeological sites and the submission of a revised landscape plan. "The

---

[7] Appellants also complain that the board, in approving the project, failed to consider the presence of a spring in the project area. However, there is substantial evidence that no spring exists within the confines of the project.

Subdivision Map Act contemplates that the local agency, when it approves a tentative map, will normally attach conditions to that approval . . . and will approve the final map only after certifying that the subdivider has complied with those specified conditions." (*Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644, 652 [150 Cal.Rptr. 242, 586 P.2d 556].) Thus, the ability to mitigate problems caused by the project is measured at the time of approval of the final map, not at the time the tentative map is approved.

### III

#### *The Project Complies With Open-space Requirements*

Open space must comprise not less than 25 percent of the net area of a residential development in an urban hillside management area and not less than 70 percent of the net area of a residential development in a nonurban hillside management area. (Los Angeles County Code, § 22.56.215(J )(1)(a).) In addition to undisturbed natural areas, open space areas may include private yards, parks, riding, hiking and bicycle trails, and landscaped areas adjacent to streets and highways. (*Ibid.*) In approving the project the board found that the project has the necessary provision for open space areas, and imposed the condition that "open space shall comprise not less than 70 percent of the net area."

Appellants contend the finding does not conform to the ordinance because it fails to specify the "quality" of the open space in the project, i.e., what percentage of the open space consists of undisturbed natural areas and what percentage comprises yards and other nonnatural areas enumerated in the ordinance. Appellants insist the public has a right to such information because the board's findings "serve a public relations function by helping to persuade the parties that the administrative decision-making is careful, reasoned, and equitable." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, 517.)

That observation by the Supreme Court does not require the detailed open-space findings which appellants claim are necessary to uphold the board's approval of the project. The board's finding that the proposed project has the necessary provision for open space areas meets the requirement that administrative findings "bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga, supra,* 11 Cal.3d at p. 515.) Findings are required to state only ultimate rather than evidentiary facts. (*Getty* v. *Getty* (1986) 187 Cal.App.3d 1159, 1177 [232 Cal.Rptr. 603]; *Lynch* v. *Cook* (1983) 148 Cal.App.3d 1072, 1080 [196 Cal.Rptr. 544].)

Accordingly, the challenged finding properly omits mention of the nature of the open space areas.

## IV

### *The Findings Are Properly Drawn*

Appellants contend that because certain findings of the board are made in the language of section 22.56.215(F) of the Los Angeles County Code, those findings are inadequate. In support of this contention appellants rely on *Topanga Assn. for a Scenic Community* v. *County of Los Angeles, supra,* 11 Cal.3d 506, wherein the Supreme Court disapproved the practice of setting forth administrative findings solely in the language of the applicable legislation. (*Id.* at p. 517, fn. 16.)

In *Jacobson* v. *County of Los Angeles* (1977) 69 Cal.App.3d 374 [137 Cal.Rptr. 909], it was held that the prohibition of findings couched in statutory language did not apply under the circumstances of that case. Said the court: "We do not . . . find anything in footnote 16 [of *Topanga*] criticizing 'the practice of setting forth findings solely in the language of the applicable legislation,' which requires invalidating findings in the language of the applicable ordinance in all cases. . . . The requirement that the administrative decision disclose the 'legally relevant sub-conclusions supportive of its ultimate decision' (11 Cal.3d at p. 516) can be fully met by findings in the language of the ordinance when the ordinance requires that the relevant sub-conclusions be specifically stated. The Los Angeles County Zoning Ordinance does just that. It requires the zoning board to reach seven specific subconclusions and, moreover, it describes these as the 'findings' which must be made. It would be a reduction to absurdity of the principle stated in *Topanga* to apply it to findings made in the language of an ordinance which thus requires full articulation of the factors upon which the decision is based." (*Jacobson, supra,* 69 Cal.App.3d at p. 391.)

Section 22.56.215(F) of the Los Angeles County Code provides in pertinent part: "Burden of Proof. The application for a conditional use permit-hillside management and significant ecological areas shall substantiate to the hearing officer the following facts." Unlike the county ordinance discussed in *Jacobson,* section 22.56.215(F) does not specify that the facts enumerated therein constitute the findings which must be made. The rationale of *Jacobson* nevertheless applies to section 22.56.215(F). Implicit in that ordinance is the condition that the permit may not be approved unless the facts set forth in the ordinance have been proved. Accordingly, the board properly made its findings in the language of section 22.56.215(F). It

would exact needless time, effort and ingenuity to require the board to paraphrase the provisions of section 22.56.215(F) in making findings in support of its approval of a conditional use permit. We refuse to impose such a requirement which, in addition to causing wasted time and effort, likely would result in inadvertent omissions or misstatements of necessary facts.

V

*Government Code Section 66474.9 Properly Authorizes the Board to Require the Developer to Defend Actions Challenging the Board's Approval of a Project*

Pursuant to Government Code section 66474.9,[8] as a condition of its approval of the project the board required the developer to defend, indemnify, and hold harmless the board from any proceeding brought against it attacking its approval of the project. While appellants' argument in this phase of the appeal appears under the heading "The Condition Of Indemnification Is An Unconstitutional Delegation Of Authority By County Board Of Supervisors," appellants cite no provision of either the federal constitution or the California constitution in support of this statement. Indeed, they do not argue unconstitutional delegation of authority at all. Appellants attack section 66474.9 on other grounds.

Appellants contend the developer's defense of this action on behalf of the board as well as the developer constitutes a breach of the rule of professional conduct which prohibits an attorney from representing conflicting interests except with the written consent of all parties concerned. (Former rule 5-102(B), Rules Prof. Conduct of State Bar.) As respondents note, that rule is inapplicable inasmuch as the interests of the board and the developer in the outcome of litigation challenging the board's approval of the developer's proposed project are not conflicting, but on the contrary are identical, viz., upholding the board's approval. Appellants disagree, arguing this litigation could be resolved by the preparation of an EIR (which action would be against the interest of the developer) and the board would be unable to prepare an EIR without the developer's consent under subdivision

---

[8] Government Code section 66474.9, subdivision (b) provides in pertinent part: "A local agency may require, as a condition for a tentative, parcel, or final map application or approval, that the subdivider defend, indemnify, and hold harmless the local agency or its agents, officers, and employees from any claim, action, or proceeding against the local agency or its agents, officers, or employees to attack, set aside, void, or annul, an approval of the local agency, advisory agency, appeal board, or legislative body concerning a subdivision, which action is brought within the time period provided for in Section 66499.37."

(d) of section 66474.9 which provides that "[t]he subdivider shall not be required to pay or perform any settlement unless the settlement is approved by the subdivider." The contention is patently meritless inasmuch as the statute refers to a settlement to be paid or performed by the *subdivider* and an EIR is not prepared by the subdivider but by a public agency. (Pub. Resources Code, § 21082.1.)

Appellants next contend that the developer's representation of both itself and the board in this proceeding violates Government Code section 1126,[9] which prohibits outside employment of local agency employees which is "inconsistent, incompatible, in conflict with, or inimical to" their duties as public employees. The validity of this argument depends on the classification of the developer's attorney as a local agency employee. Persons, such as the developer's attorney, who perform "specialized expert services [for a county] do so on a temporary basis and are neither officers nor employees, nor do they hold a position with the county." (*Handler* v. *Board of Supervisors* (1952) 39 Cal.2d 282, 286 [246 P.2d 671].) Further, section 1126 prohibits only outside employment of local agency employees *for compensation,* whereas in the present case the developer represents the board in this proceeding by way of indemnification, not for compensation.

■ Finally, appellants attack Government Code section 66474.9 on the ground it "permits the [board] to transfer the cost of its administrative lapses, failures and omissions to" the developer, the party who most benefits from such "misfeasance." This argument should be addressed to the Legislature, not to us. "Courts do not sit as super-legislatures to determine the wisdom, desirability or propriety of statutes enacted by the Legislature." (*Estate of Horman* (1971) 5 Cal.3d 62, 77 [95 Cal.Rptr. 433, 485 P.2d 785].) As long as that body does not exceed its powers, and its judgment is not influenced by corruption, a court cannot substitute its judgment for that of the Legislature. (*Thurston* v. *Southern Cal. Public Power Authority* (1984) 158 Cal.App.3d 236, 239 [204 Cal.Rptr. 546].) ■ Likewise without merit is appellant's further argument that section 66474.9 is against public policy "as being detrimental to the citizens' confidence in fair and equal enforcement of the laws of the State of California." A statute is not subject

---

[9] Government Code section 1126 provides in pertinent part: "(a) [A] local agency officer or employee shall not engage in any employment, activity, or enterprise for compensation which is inconsistent, incompatible, in conflict with, or inimical to his or her duties as a local agency officer or employee or with the duties, functions, or responsibilities of his or her appointing power or the agency by which he or she is employed. Such officer or employee shall not perform any work, service, or counsel for compensation outside of his or her local agency employment where any part of his or her efforts will be subject to approval by any other officer, employee, board, or commission of his or her employing body, unless otherwise approved in the manner prescribed by subdivision (b)."

to objection on the ground it contravenes public policy because, as a legislative enactment, it becomes public policy. (*English* v. *Marin Mun. Water Dist.* (1977) 66 Cal.App.3d 725, 730 [136 Cal.Rptr. 224], disapproved on other grounds in *Delta Farms Reclamation Dist.* v. *Superior Court* (1983) 33 Cal.3d 699, 707 [190 Cal.Rptr. 494, 660 P.2d 1168].)

## VI

*Appellants May Not Complain of the Board's Delegation of Authority*

While appellants' contention is unclear, they appear to argue as follows: Because the board improperly delegated to "staff" the power to make discretionary decisions regarding the conditions of approval of the project, and those decisions were not made until after expiration of the 90-day statute of limitations for seeking review of the board's approval (Gov. Code, § 65907), appellants would have had no means of challenging the conditions imposed if, instead of timely filing the petition in this action, they had relied on the good faith of respondents in formulating the conditions.

Inasmuch as the petition was timely filed the point which appellants appear to raise is moot and thus will not be considered. ██ "An appellate court will not review questions which are moot and which are only of academic importance. It will not undertake to determine abstract questions of law at the request of a party who shows that no substantial rights can be affected by the decision either way." (*Keefer* v. *Keefer* (1939) 31 Cal.App.2d 335, 337 [87 P.2d 856].)

### DISPOSITION

The judgment is affirmed.

Woods (Fred), J., concurred.

Johnson, J., concurred in the judgment.

A petition for a rehearing was denied December 1, 1989.